384 So.2d 881 (1980)
Jack J. NEARY, Appellant,
v.
STATE of Florida, Appellee.
No. 51691.
Supreme Court of Florida.
May 15, 1980.
Rehearing Denied July 11, 1980.
*882 Richard M. Saccocio, Sp. Public Defender, Fort Lauderdale, for appellant.
Jim Smith, Atty. Gen., and Charles W. Musgrove, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
The appellant, Jack J. Neary, was convicted by a jury of first-degree murder, robbery, burglary, and sexual battery. After a jury recommendation of life imprisonment, the trial judge imposed the death sentence for the first-degree murder conviction. We have jurisdiction.[1] We affirm the conviction but reduce the sentence to life imprisonment in accordance with the jury recommendation.
The relevant facts are as follows: On September 25, 1976, a Volkswagen automobile was found submerged in a canal in Hollywood, Florida. Investigating officers found a woman's purse in the car. Contents of the purse revealed that its owner was Mrs. Laura Cagle, a sixty-six-year-old resident of a nearby trailer park. The initial attempts to locate her, including a visit to her trailer home, were unsuccessful. In the second visit to her trailer home, officers found Mrs. Cagle's half-clothed body hidden underneath a foldout bed. An examination of the victim's body revealed that she had been raped and strangled. Investigators found two blue buttons on the floor of the bedroom where the victim's body was discovered.
After conferring with Mrs. Cagle's relatives, the investigators determined that certain diamond rings were missing. The rings were later recovered by the officers from Wayne Edward Morris who stated that he received them from Darry Smithers. Smithers gave a sworn statement on September 28 stating he had received the rings from the appellant, Jack Neary.
Appellant was eighteen years of age and resided with his grandmother in the same trailer park as the Cagle trailer home. Neary had previously served as an informer in several local burglaries. On September 29 two detectives visited appellant's residence. Neary was awakened by his grandmother and agreed to talk with the officers. The grandmother asked them to withdraw from the living room in order for her to continue to watch television. The officers and Neary went to the rear of the trailer to Neary's bedroom. The record fails to reflect any objection by Neary to the officers' moving with him to this location. The officers and Neary talked for a short time but not about any specific crimes. While in the bedroom Detective Jadwin noticed a blue shirt hanging in an open closet. He reached in and removed it from the clothes rack and remarked that he owned one like it. Both detectives noticed that buttons were missing from the shirt. Jadwin also noticed a shirt with a reddish-colored stain on it lying on the floor of the closet. At the conclusion of the questioning, Neary accompanied the officers to the police station.
While Neary was at the police station, the police obtained a warrant to search Neary's room. The affidavit in support of the warrant specifically set forth the following: (1) the discovery of Mrs. Cagle's car; (2) the two searches of the Cagle home; (3) the discovery of the body of Laura Cagle, its position, and the fact that her death was caused by strangulation; (4) that missing diamond rings of the deceased had been recovered by the police and were traced through a chain of possession which began with Neary; (5) that a blue shirt was hanging in Neary's closet and a shirt with a reddish-colored stain was lying on the floor of the closet; and (6) that buttons were missing from the blue shirt, as observed by Detectives Jadwin and Cormican during the visit to Neary's trailer, and the buttons remaining on the shirt appeared to be the same type as those discovered in the bedroom of the deceased. Pursuant to the warrant, items of clothing including the stained shirt and the blue shirt with the two missing buttons were seized from the residence of the appellant.
*883 Upon his arrival at the police station, Neary had been given Miranda warnings. Two interrogation sessions were held, during the latter of which officers confronted Neary with the incriminating results of the search. At the conclusion of the interrogations Neary confessed to the Cagle murder and implicated the codefendant, Mark Eubank.
Neary and Eubank were tried jointly. At trial, all references to Eubank were deleted from the Neary confession pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Also, expert testimony revealed that the buttons found in the victim's trailer contained the same thread and cloth fiber as that of the blue shirt, and that the threads securing the buttons were knotted in an identical fashion. At the close of the state's case, Eubank's motion for directed verdict was granted. Neary's motion for directed verdict was denied, and he subsequently was convicted of all counts charged.
During the sentencing phase the jury was presented with the entire confession which reflected that Eubank played a significant role in the perpetration of the offenses. Mitigating evidence was also provided by appellant's grandmother who testified that Neary was a slow learner and had needed special assistance to keep up in school. Further testimony established that Neary had grown up without a father and had been reared by his mother and another woman.
The jury recommended a sentence of life imprisonment. The trial judge, however, rejected this recommendation and imposed the death sentence, finding that the capital felony was committed in the course of a burglary, robbery, and rape; that it was committed both for pecuniary gain and to avoid arrest; and that it was especially heinous, atrocious, and cruel. The trial court considered all the statutory mitigating circumstances and rejected each. In considering Eubank's participation as a codefendant, the trial court found that Neary's "participation in this capital felony was extremely dominant and major, and the capital felony was committed by the defendant, Jack Joseph Neary." The trial court further found:
[T]he Defendant was under no duress or disturbance. The Defendant did drop out of school in the eighth grade. He has an I.Q. of approximately 90 and on a full scale approximately 103. Generally, I would say average to below average. He is neither brilliant nor is he dumb. His formal education speaks for itself. He has not seen his father since the age of three and has seen his mother often during his life. He was raised by his maternal grandmother. Disciplining the Defendant was difficult for the grandmother because of the age discrepancy; but his grandmother definitely raised this Defendant teaching him right from wrong and providing him with great moral guidance and religious and theological training. She loved and cared for him by high standards and the Defendant was taught those standards and was fully aware and conscious of them. The Defendant did appreciate the criminality of his conduct and his ability to conform his conduct to the requirements of law was not impaired at the time of the capital felony.
Neary contends that his conviction should be set aside on the grounds that: (1) the entry into his room by the detectives which led to the discovery of the incriminating blue shirt constituted an unreasonable search; (2) if the search was unreasonable, then the confession must also be suppressed as "fruit of the poisonous tree", (3) the incidental observance by four jurors of Neary wearing handcuffs and shackles prior to the commencement of the third day of the trial unduly prejudiced those jurors against him; (4) cumulatively, the admission of a deposition by a physician leaving the country together with the admission of a vial of the victim's blood and comments by the prosecution in final argument deprived him of due process; and (5) the evidence against him was insufficient.
The first two grounds concern the validity of the seizure of the blue shirt with two missing buttons. The record is clear that *884 Neary permitted the officers to enter his bedroom, and that their presence together with the observance by one officer of the blue shirt hanging in the closet was proper and reasonable. The only possible improper conduct resulted from the officer's removing the shirt from the clothes rack to determine if two buttons were missing. The officers, however, did not seize the shirt at that time and only made their findings known in the affidavit for the search warrant which was subsequently issued.
We recognize that there is a problem concerning the extent to which an officer may take overt action to determine whether an object in open view is evidence of a crime. Only a few cases have dealt with this particular issue. In State v. Holloman, 197 Neb. 139, 248 N.W.2d 15 (1976), officers went to the home of a suspect in a rape case, knocked on the door, and were admitted by the defendant. The officers informed him that they wished to question him. The defendant agreed to accompany the officers but first retired to a bedroom to dress. While the defendant was out of the room, one officer noticed several pairs of shoes lying on the floor. Prior to his arrival, the officer knew that several footprints and heelprints were left on the ground outside the home of the victim. He picked up some shoes and noticed that the heels of one pair resembled the imprints left on the ground. The shoes were seized. The Nebraska Supreme Court, in considering the defendant's plain view challenge to the search, held the seizure proper. The court recognized that although the shoes were in open view and the heels were not, the officer had the "right to scrutinize these shoes more carefully, and to examine them, including lifting them up and turning them over." Id. at 144, 248 N.W.2d at 19. In United States v. Woods, 560 F.2d 660 (5th Cir.1977), cert. denied, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978), the officers arrived at the defendant's home to execute an arrest warrant. They were led through the home by another occupant. On passing through one room, an officer observed "three to four inches of a shotgun barrel protruding out from under the front of a cabinet." Id. at 662. The defendant contended on appeal that the seizure of the shotgun could not be sustained on a plain view theory because it was not immediately apparent that the object observed was contraband and that it could just as easily have been a pipe. The Fifth Circuit rejected this contention and relied on the experience of the investigating officer who could have readily and reasonably suspected the object as being a shotgun barrel in order to satisfy the "immediately apparent" element of the plain view test.
Although the plain view doctrine may allow this type of examination, it does not authorize search and seizure of items contained within such objects as: a file folder standing among sixty or seventy other files on a counter top, United States v. Scios, 590 F.2d 956 (D.C. Cir.1978) (En Banc); file cabinets, United States v. Jackson, 576 F.2d 749 (8th Cir.1978); or a billfold, United States v. Berenguer, 562 F.2d 206 (2nd Cir.1977).
There are three conditions necessary to sustain a plain view search under Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). These conditions require that: (1) the police officer must be in a place where he has a lawful right to be; (2) in the course of his presence the officer inadvertently comes upon an object which is openly visible; and (3) it must be immediately apparent to the officer that the object constitutes evidence of a crime.
Although it is conceivable that the facts and circumstances in this case meet the plain view doctrine of Coolidge, it is not necessary for this Court to rely upon that doctrine to uphold the search warrant. The law is clear that a search warrant is not invalidated by inclusion of illegally obtained evidence in the supporting affidavit where the affidavit contains other valid allegations sufficient to establish probable cause. Thus, the critical question is whether the independent and lawful information stated in the affidavit suffices to show probable cause. United States v. DiMuro, 540 F.2d 503 *885 (1st Cir.1976); Howell v. Cupp, 427 F.2d 36 (9th Cir.1970); United States v. Sterling, 369 F.2d 799 (3d Cir.1966); Chin Kay v. United States, 311 F.2d 317 (9th Cir.1962); United States v. Epstein, 240 F. Supp. 80 (S.D.N.Y. 1965).
The information in the affidavit reciting that Neary had initially possessed the victim's diamond rings, that he lived in the same trailer park where the victim lived, that blue buttons from a blue shirt were found at the crime scene, and that a blue shirt hung in appellant's closet, was sufficient of itself to establish probable cause for the search warrant without the allegation that the shirt was missing blue buttons. Under the circumstances, we hold that the search was reasonable and that the admission into evidence of the blue shirt and the incriminating buttons was proper. Since the search was proper, we need not address the invalidity of the confession as the fruit of an unreasonable search.
The contention that Neary was prejudiced because some jurors inadvertently saw him being brought to the courtroom in handcuffs is without merit. We recognize that an individual accused of a crime cannot be forced over his objection to stand trial in prison garb. Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). This appellant, however, was not forced to stand trial in prison clothes or in handcuffs, and we find that the inadvertent sight of the appellant in handcuffs was not so prejudicial that it required a mistrial.
The assertion of cumulative errors committed by preserving the testimony of a nonresident doctor leaving the country permanently, the introduction of a vial of the victim's blood, and prosecutorial comments during closing argument is without merit. The appellant was present at the taking of the doctor's deposition. Appellant's rights were properly protected by the procedure used in preserving the doctor's testimony. Although the introduction of the vial of the victim's blood taken and identified by the serologist during his testimony may not have been necessary, such did not amount to reversible error. With reference to the third asserted cumulative error, we find that the prosecutorial comments were not objected to and do not constitute prejudicial error. In conclusion, we find that the evidence is clearly sufficient and that the record sustains conviction on each charge.
In reviewing the propriety of a death sentence, this Court has previously held that it must weigh heavily the advisory opinion of life imprisonment by the sentencing jury. The facts justifying the death sentence must be clear and convincing in order to overrule the jury's recommendation. Malloy v. State, 382 So.2d 1190, No. 49,580 (Fla. Dec. 20, 1979); McCaskill v. State, 344 So.2d 1276 (Fla. 1977); Tedder v. State, 322 So.2d 908 (Fla. 1975). It is our duty to examine the record in this cause and determine whether there are clear and convincing facts that warrant the imposition of the death penalty over a jury's recommendation of life imprisonment.
The record in this cause reflects that with one exception the same facts and circumstances before the jury were also before the judge. The only additional factor not before the jury was a presentence investigation report, prepared and submitted by a parole and probation supervisor, that recommended a sentence of death. That report contained no new factual information but did contain a subjective evaluation and opinion of the probation supervisor.
From our objective review of the record, the jury was apparently influenced in its recommendation for life imprisonment by the following factors: (1) Neary's youthful age at the time he committed this crime; (2) Mark Eubank, the codefendant, was dismissed on a motion for directed verdict at the conclusion of the state's case; (3) during the sentencing phase the jury was allowed to hear Neary's entire confession without references to Eubank being deleted, as had been done during the trial phase of the case;[2] the confession in its entirety indicated that Eubank had played a significant *886 role in the perpetration of this criminal act; and (4) Neary was a slow learner and needed special assistance to keep up in school, and he grew up without a father and *887 was reared by his mother and another woman. Given all the facts and circumstances, including Eubank's dismissal, we find that the action of the jury was reasonable.
The state urges that this case is indistinguishable from Hoy v. State, 353 So.2d 826 (Fla. 1977), cert. denied, 439 U.S. 920, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978), in which *888 we upheld the trial court's sentence of death despite a jury recommendation of life imprisonment. In our view the factual circumstances of the two cases are clearly distinguishable, and we are unable under the circumstances of this case to affirm the imposition of the death penalty.
In conclusion, we have carefully reviewed the order of the trial judge and fully recognize his reasons for the imposition of the death penalty under the circumstances of this rape-murder. We find, however, that the jury's recommendation of life imprisonment should have been accepted by the trial court.
For the foregoing reasons, we affirm the appellant's convictions and sentences with the exception of the death sentence which we reverse and remand with directions to enter an order sentencing the appellant to life imprisonment without the possibility of parole for twenty-five years.
It is so ordered.
ENGLAND, C.J., and BOYD, OVERTON, SUNDBERG and ALDERMAN, JJ., concur.
ADKINS, J., concurs as to the convictions, and dissents as to the sentences.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Material portions of the confession presented to the jury are as follows:

Q. And you and MARK did go to the trailer court?
A. Yes.
Q. What, if anything, did you do at the trailer court?
A. Went in the trailer court (inaudible) so we went down and came back around, stopped about Center Street, behind Center Street, got out of the car and went over toward LAURA CAGLE's house, we went in.
Q. How did you get in JACK?
A. Opened the window and just went in.
Q. Which window JACK?
A. On the door.
Q. How did you open that window?
A. Just lifted it open.
Q. Was there a screen? Did you have to push a screen in or was there to have been a screen there?
A. There was and it must of already been pushed out a little bit.
Q. What kind of window was this?
A. Trailer windows on every door, like jalousies.
Q. Did you pull it out or did you push it up or did you push it in?
A. (Hand jesture [sic] indicating that he pulled it up).
Q. Pulled it up. And how did you get the door open?
A. (No response).
Q. Did you go inside the trailer then?
A. Yes.
Q. Where was ... Go ahead.
A. Me and MARK were inside, just like looking around (inaudible). I went to the bathroom part, there's diamonds on the sink.
Q. OK, when your [sic] talking diamonds, are you talking about diamonds just setting there or ...
A. Diamond rings.
Q. Do you remember how many were there?
A. Four (4).
Q. OK, and where was MARK when this was happening?
A. He was right behind me.
Q. Did he see the diamond rings in the bathroom?
A. Yes.
Q. And what did you do with the diamond rings?
A. Put them in my pocket.
Q. Right at that point?
A. Yes.
Q. What happened then JACK?
A. Then we heard somebody cough and we got scared. We went and looked into the bedroom.
Q. JACK, let me make sure I understand this. You just said you and MARK entered the trailer and you found the diamond rings in the bathroom?
A. Yes.
Q. And you heard someone cough?
A. Yes.
Q. And you looked into the bedroom?
A. Yes.
Q. What happened after that?
(SUSPECT IS CRYING AT THIS TIME)
Q. Were you afraid?
A. Yes.
Q. Did you know who that old lady was?
A. I had an idea.
Q. She knew you, didn't she?
A. Yes.
Q. Did she wake up?
A. Yes.
Q. Then what happened when she woke up JACK?
(NO RESPONSE  CRYING)
Q. What happened when she woke up JACK?
A. She got up.
Q. She got up.
A. She sat up on the bed like. She screamed.
Q. Did she call you by name JACK?
A. I don't know, it's possible, I don't know, (inaudible).
Q. Did she say anything to you?
A. I don't know, I can't remember.
Q. OK, but at this point you and MARK were in the bathroom, right?
A. When she was screaming?
Q. Yes.
A. We were in the bedroom.
Q. Is the bedroom right by the bathroom?
A. Yes.
Q. Take that cigarette, JACK, do you want a cigarette.
A. Yeah.
Q. Huh?
A. Yes.
Q. She got up and sat in the bed.
A. She was like sitting up in bed, and I was scared. I guess I don't know what I was doing. I just grabbed her throat to keep her quiet. Then she went to hit me and she scratched me. Then she grabbed ahold of my shirt and she was kicking and everything. She kicked MARK and MARK fell down. He got back up and said let's go. Then he said wait a minute.
Q. MARK said wait a minute?
A. Yes.
Q. What did he say then?
A. I go why.
Q. What did MARK say when you said why?
A. Oh God, take off her pants.
Q. MARK said take off her pants. Did you take off her pants JACK?
A. Yes.
Q. What happened then JACK?
(NO RESPONSE  CRYING)
Q. What happened then JACK? MARK said take off her pants.
A. I took them off.
Q. You took her pants off?
A. Yes.
Q. Then what happened JACK?
A. I kept asking him why.
Q. And what happened then JACK?
(NO RESPONSE  CRYING)
Q. What happened then JACK?
(NO RESPONSE)
Q. JACK, did MARK have sexual relations with LAURA CAGLE?
A. Yes.
Q. MARK EUBANK had sexual relations with LAURA CAGLE?
A. Yes.
Q. JACK, did you have sexual relations with LAURA CAGLE?
A. Yes.
Q. Who first had sexual relations with LAURA CAGLE?
A. MARK did.
Q. Was she still alive?
A. Yes.
Q. What?
A. Yes.
Q. Did either one of you or MARK have relations, sexual relations anally with her? Do you know what I mean?
A. No.
Q. Did you put your penis in her rectum?
A. Yes.
Q. Did you?
A. Yes.
Q. Did MARK?
A. Yes.
Q. What happened after that JACK?
(TAPE STOPPED  SUBJECT BECAME EMOTIONALLY UPSET  SEVERAL MINUTES ELAPSED  SUSPECT CRYING)
Q. JACK, just so I understand it right, you and MARK both had relations with LAURA CAGLE.
A. Yes. I just got on top of her and "got off." I can't really remember that.
Q. OK, what happened after you completed your relations with LAURA CAGLE?
A. Then she wasn't moving any more.
Q. OK.
A. So, we rolled her off the bed and threw the cover back on and then I just turned on the light (inaudible) and then MARK got a rag and he was wiping the fingerprints and stuff, he was wiping all the doors and everything. Then we went out to the kitchen and I went back to the bedroom and I got her pocketbook. I put everything in her pocketbook and then I was by the door and he was looking out the door and everything and he said OK let's go. So I go OK and I had the keys to the car that I found on the sink part.
Q. The kitchen counter?
A. Yes. Then I told him to meet me by Rotary Park in back of the big warehouse and he said OK, so I left and drove the car.
Q. LAURA CAGLE's car?
A. Yes, Volkswagon [sic].
Q. What color was the Volkswagon [sic]?
A. Green.
Q. Was it an automatic transmission?
A. Yes.
Q. Or standard shift?
A. It was on the floor.
Q. It was LAURA CAGLE's car?
A. Yes.
Q. Why did you take that car JACK?
A. I don't know. I just took the car. I don't know.
Q. You took it behind the big warehouse by Rotary Park?
A. Yes. I got out and I looked around and then I drove it to the canal and I jumped out before it went in the water. Then MARK was over by the railroad tracks with his lights on. I went over there and he took me home.
Q. Have you talked to MARK since this happened?
A. No.
Q. Whose idea was it to go to the trailer JACK?
A. Mine.
Q. What were you specifically looking for when you went to that trailer JACK?
A. Diamond rings.
Q. Did you have any one particular diamond ring in mind?
A. The one that was like a flower. It was supposed to be worth a lot of money.
Q. Who told you the diamond ring was worth a lot of money?
A. Just somebody, I don't want to get involved.
Q. Did JOE JOE tell you?
A. No.
Q. Was this person there when you broke into the trailer?
A. No.
Q. Have you told this person about what you did?
A. No. I didn't even see the person after that.
Q. When you were in that trailer JACK and you went to the back bedroom, was LAURA CAGLE wearing anything?
A. Yes.
Q. Do you remember what she was wearing JACK?
A. No.
Q. OK JACK, you had the diamond rings and MARK took you home.
A. Yea.
Q. How much money did you think those diamond rings were worth?
A. I only thought they were worth about $200, $300.
Q. Were you and MARK supposed to split the money from the diamond rings?
A. Yes. He told me if I couldn't sell them he could sell them but I told him I'd probably be able to sell them.
Q. What did you do with those rings?
A. I took them over to DARRY SMITHERS' house to see if he could sell them.
Q. You took them to DARRY SMITHERS' house to see if he could sell them?
A. Yes.
Q. And how much money was he supposed to get for them?
A. He said (inaudible).
(SOMEONE FROM OUTSIDE THE ROOM CALLED THE NAME NEARY AND HE FELT SOMEONE WAS CALLING HIM).
Q. Have you talked to DARRY SMITHERS since you gave him those diamond rings?
A. I seen him and he said he was still getting an estimate on them so I said alright [sic] and also I'll be back tonight to get them and he said OK. I went back and he wasn't home so I just didn't think nothing of it and then the next day that's when you guys came to talk to me.
Q. Have you told anybody else about this?
A. (inaudible).
Q. Do you remember who told you that MRS. CAGLE had these diamonds?
A. Yes, but I'm not saying the name.
Q. Is that the reason why you went to that trailer that night?
A. Yes, cause I wanted to get out of the state.
Q. JACK, did you have a conversation with your brother DENNIS NEARY in the Broward County Jail after this offense and related to him what you did?
A. No. I didn't tell him nothing.
Q. Before you broke into that trailer JACK, did MARK know that you were going to that trailer for the reason of getting those rings?
All references to Eubank were deleted from this confession during the trial phase of the cause because of the decision of the United States Supreme Court in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).