638 So.2d 1032 (1994)
STATE of Florida, Appellant/Cross-Appellee,
v.
John WATERMAN, Appellee/Cross-Appellant.
No. 91-03843.
District Court of Appeal of Florida, Second District.
June 22, 1994.
*1033 Robert A. Butterworth, Atty. Gen., Tallahassee, and Carol M. Dittmar, Asst. Atty. Gen., Tampa, for appellant/cross-appellee.
James Marion Moorman, Public Defender, and Deborah K. Brueckheimer, Asst. Public Defender, Bartow, for appellee/cross-appellant.
DANAHY, Acting Chief Judge.
The State of Florida appeals from an order which partially granted John Waterman's motion to suppress. The state contends that the trial court erred in suppressing items seized from Waterman's car and home. Waterman cross-appeals that portion of the order which otherwise denied his motion to suppress. He contends that his initial arrest for loitering and prowling was invalid, that statements he made after his invalid arrest should have been excluded, and that the search warrant for his house was defective. We find no merit in the issues Waterman raises in his cross-appeal and affirm the partial denial of his motion to suppress. On the state's direct appeal, we affirm in part and reverse in part.
Waterman's next-door neighbor in the city of Sarasota was found murdered on June 13, 1991. Her body, wrapped in a bedsheet and bound around the neck, waist, and ankles with traverse curtain rod cord bearing a unique knot, was dumped in a rural section of eastern Sarasota County. There was a ligature around her neck also and ligature marks on her wrists. After inspecting her apartment, which was open and undisturbed, Sarasota County sheriff's detectives theorized that the murderer was someone close by or someone who knew about her activities. Because black, gray, and silver fibers similar to car trunk lining or auto carpeting were found on the body, but few fibers of any kind were found on the bedsheet in which the body was wrapped, the detectives further theorized that the body was transported in two different cars.
Approximately five weeks later, Detective Don Wenger of the Sarasota County Sheriff's Office, who lived on the same street as the victim but about five blocks away, noticed an unfamiliar late model Buick parked on the street across from his home at 10 p.m. in front of the darkened and vacant house there. The Buick had not been there when he arrived home fifteen minutes earlier and the driver was nowhere to be seen. Suspecting the car was stolen, the detective radioed from his car to check the license tag number and found that it was registered to an elderly woman who lived on Gulfstream Drive in downtown Sarasota. Wenger then waited in his own car about twenty minutes. He saw Waterman come out from behind the vacant house and approach the Buick as its trunk opened automatically. Waterman did not have a flashlight and was dressed completely in black. Believing Waterman did not have a legitimate reason to be there, Wenger approached Waterman, identified himself as a sheriff's deputy, and asked him what he was doing there. Waterman replied that he might be interested in buying the house. As he was replying to the detective, his demeanor was very nervous, he spoke with a quivering voice, and would not look the detective in the eye.
There had not been a "For Sale" sign on the house, and Wenger was not otherwise aware that the owner was interested in selling it. Wenger asked Waterman why he thought the house was for sale. Waterman responded that he lived five blocks away and was considering relocating because he had some problems in his neighborhood. Spontaneously, Waterman mentioned that he lived next door to the murder victim, named her, and asked if Wenger were working on that case and if police were making any progress on it. During the conversation Wenger glanced into the open trunk, saw a bag of some type, and noticed that the carpeting was black and gray. He recalled that the same color fibers had been found on the victim's body and that investigators believed she had been transported in a car's trunk.
Wenger's suspicions about loitering and prowling had not been allayed by Waterman's explanations. Although Wenger believed *1034 he had probable cause to arrest Waterman for loitering and prowling he preferred not to do so because he was within Sarasota city limits. He called Sarasota City Police and requested they come to the scene. Sarasota City Police Officer Brenda Redden arrived quickly and Wenger briefed her on his suspicions about Waterman's loitering and prowling, but not about Waterman's comments relating to the victim and the ongoing investigation. Redden had her dispatcher call the owner of the Buick to ask if the owner knew where the car was. The owner replied that she believed it was parked in the garage of her condominium but that if Waterman had it, that was permissible.[1] Officer Redden interviewed Waterman while Wenger checked around the house and backyard.
In the backyard Wenger discovered that, although the house showed no signs of burglary, through a gap in the fence at the back of the yard, one could see into the next house. Wenger knew that a woman and her two teenage daughters lived there. Wenger returned and related what he had seen to Redden.
During the interview with Officer Redden Waterman did not allay her suspicions either so she arrested him for loitering and prowling and transported him to the Sarasota County Jail. Meanwhile, Wenger contacted one of the sheriff's deputies investigating the murder, Detective Penny Kimball, to acquaint her with Waterman's arrest and Waterman's expressed interest in the murder investigation. Kimball's notes did not show that Waterman had been interviewed as part of the neighborhood canvass at the time the homicide was discovered so she was very interested in speaking to him. Accordingly, she went to the jail to speak to him during the booking procedures on the loitering and prowling charge.
Just as the booking procedures were getting underway, Detective Kimball read Waterman his Miranda rights and he voluntarily agreed to be interviewed about the murder. Because of the noisy booking area they were in, the detective sought a quieter place and conducted the interview in the detectives' offices in a nearby building. Waterman was cooperative and did not invoke his right to counsel or ask to call a friend or a family member. He stated he was willing to talk about the case because he felt badly about the death of his neighbor. Waterman said he lived with his fiancee and worked as a security guard at Bay Plaza Condominium and as a chauffeur for an elderly woman who lived there. He was living at his current residence when the homicide victim moved in next door. He had never been formally introduced to her but knew what she looked like since he had seen her unloading groceries, going to the mailbox, and doing other things at the residence. He knew she rented a separate apartment attached to the house next door to his and that two men occupied the front part of that house. He knew what type of car she drove, that she was sometimes gone for several days at a time, and that friends of hers had a blue van or large white vehicle which would sometimes be parked out front.
Waterman admitted that he had a lot of rope around his house, commenting that one could never have enough rope. He said he also kept rope in his car. He had recently obtained a quantity of cord from a traverse curtain rod he had gotten from Bay Plaza. He described how his house was decorated and listed the colors of his sheets which matched the kind in which the victim was wrapped  beige with brown trim. He discussed his sexual relations with his fiancee telling the detectives that at one time he had tied her to the bed but that he had cut the bindings off after she complained they were too tight and caused her discomfort. Kimball noticed a prominent wound in the middle of his forehead which Waterman said had come from hitting his head against the top of a car trunk while he was parking cars. He explained away almost healed scratches on his forearms as having been inflicted by a cat. He said that during the week of the homicide he had worked as a chauffeur every *1035 morning, showered at home, and returned to the condominium to work security from 3 to 11 p.m. He occasionally kept the Buick overnight to get it washed and serviced but did not recall if he had done so the week of the murder.
He agreed to undergo a polygraph test and seemed, according to the polygraph examiner, very interested in all the procedures, even eager to take the test. While the polygraph was being administered, two detectives went to inspect Waterman's own car, a Renault, which was parked in the garage at the Bay Plaza condominium complex, his place of employment. The first three floors of the garage were used for valet parking by the businesses at Bay Plaza. There was a swinging-arm type gate at the entrance to the garage which was operated by a security guard. The garage levels above the first three floors were private and secured for condominium residents only. A floor-to-ceiling gate divided the first three floors of the garage from the more secure, residents-only, floors above. Employees and residents could drive their own cars into the garage upon being identified by the security guard. Waterman's Renault was located on the second level but below the secure, residents-only parking area. The security guard on duty at the time voluntarily showed the detectives to the Renault when they requested to view it.
The detectives inspected the car from the outside. It had vinyl seats which were not conducive to transferring fibers. They believed this was consistent with the lesser number of fibers found on the sheet wrapped around the body of the homicide victim. Using a flashlight to look into the car through the windows they saw a thin white piece of cord lying between the front seats. The cord had the same unique knot and loop that was on the ligature found around the victim's neck. The detectives stood outside the car and took Polaroid pictures of the car and, through the windows, of the uniquely-knotted cord inside. They then returned to the sheriff's office and related what they had seen to the other officers, learning from the polygraph examiner that Waterman had failed the test.
After hearing about the evidence in the car, the polygraph examiner told Waterman that he had failed the test and that the examiner believed Waterman had killed the victim. When shown the Polaroids taken of the cord in his car, Waterman gave conflicting statements about how long that cord had been in the car. At this point he invoked his right to counsel. This occurred at approximately 4 a.m. The detectives stopped interviewing Waterman and about 5 a.m. they returned him to the jail to complete the booking procedures for his arrest on the loitering and prowling charge. At about the same time that Waterman was being transported back to the jail for completion of the loitering and prowling booking procedures, Detective Sims began to prepare the affidavits and search warrants for the two cars and other detectives went with a tow truck to the garage at the condominium to seize Waterman's Renault. The detectives never entered the car while it was still in the condominium's garage. They impounded the car at 5:15 a.m.
Detective Sims was in charge of preparing the affidavits and search warrants for the cars. Since he would need two affidavits, one for the Buick and one for the Renault, and the same facts would support both warrants, he first prepared one affidavit leaving the space where the vehicle would be described blank so it could be photocopied and used for the other by filling in each vehicle's identification information after photocopying. When the warrants themselves were prepared, the identifying information on each car was in place on the affidavits but police neglected to insert the same information on the warrants. Thus, when the affidavits and warrants were presented to the reviewing magistrate, the space for the description of the property to be searched on each warrant was blank.[2]
Detective Sims appeared before the magistrate and presented him with two separate multi-page documents each held together by a paper clip. Each warrant was two pages and each supporting affidavit was five pages. The magistrate read over both documents, *1036 swore Sims to verify the facts adduced, and signed each warrant. When Detective Sims was executing the warrant on the Renault he began to read aloud the description of the property to be searched and realized that the warrant did not contain the required description. He therefore flipped over the pages to the supporting affidavit and read aloud the correct description of the Renault before he flipped back to the warrant to finish reading it. After the warrant was read, the Renault's VIN was checked against the VIN contained in the affidavit. At no time was there ever a doubt that the correct car would be searched since the officer executing the warrant was the same officer who had prepared it and the affidavits and who had appeared before the issuing magistrate. The officers entered the car, searched it, and seized various items, including the incriminating cord with the unique knotted loop in it mentioned above.
Waterman moved to suppress. The trial court partially granted his motion and suppressed all the evidence seized from the Renault, including the cord with the unique knot. In its studied and comprehensive order the trial court found there was probable cause to search the Renault but suppressed the Renault's contents because it found that there were no exigent circumstances excusing the need for a warrant. Although the police had obtained a warrant, the court found the warrant so defective that it could not support the search either because of the missing description of the property to be searched. The trial court further decided that the affidavit accompanying the warrant, and which had the Renault's full description, was not incorporated in the warrant to cure the defect. Finally, the trial court refused to apply the good faith exception to the warrant requirement because the warrant was so defective on its face that an officer could not have, in good faith, relied upon it. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
On appeal, the state argues (1) that there were exigent circumstances justifying the seizure and search of the Renault under the automobile exception to the warrant requirement, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), thus obviating the need for a warrant; or (2), if there were no exigent circumstances, that the defect in identifying the property to be searched in the description portion of the warrant was cured by the affidavit which was properly incorporated into the warrant; or (3), if the affidavit did not cure the defect, that the officers acted in good faith pursuant to Leon in relying on the warrant despite its deficiencies in identifying the property to be searched.
We find, as did the trial court, that under the totality of the circumstances known to the police there was probable cause to seize the Renault when they did so at 5:15 a.m. Waterman had been voluntarily talking to the police before and after the detectives first inspected his car at the garage, at all times after being apprised of his right to remain silent. His statements were but part of the accumulation of circumstances contributing to the finding of probable cause. Furthermore, incriminating items were seen in his car when the police looked into it from a place where they had a right to be. See Ensor v. State, 403 So.2d 349 (Fla. 1981) ("open view" of contraband contrasted to "plain view"). But, as Ensor teaches, once probable cause exists because of an "open view" of incriminating evidence, the police must obtain a warrant, unless an exception to the warrant requirement is present, to justify entry into the protected area and the seizure of the evidence. The trial court granted suppression of the items found in the Renault because it concluded there were no exigent circumstances present excusing the need for the search warrant. We disagree.
The trial court properly perceived that no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances. Taylor v. U.S., 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932). In the case before us, however, the car's ready mobility created the exigent circumstances and fulfilled the requirements of the automobile exception to the warrant requirement. Thus, the police had all they needed to seize and search the car at the moment they saw the incriminating rope tied in its unique way inside the car. A vehicle's ready mobility, as *1037 well as its pervasive regulation by the state, as Carroll recognized, has long justified a warrantless search or seizure of it once probable cause exists. See, e.g., Adoue v. State, 408 So.2d 567 (Fla. 1981) (warrantless seizure of marijuana in airplane in "open view" circumstances proper notwithstanding plane parked and secured by police); Hendrix v. State, 456 So.2d 494 (Fla. 2d DCA 1984) (car had ready mobility even when in garage being repaired, where repairs about to be completed and friend of defendant arriving shortly to take possession of it); State v. Hicks, 579 So.2d 836 (Fla. 1st DCA 1991) (ready mobility of car provided exigent circumstances to search it for evidence that it was stolen when it was parked in bank parking lot even though defendant already in custody); State v. Starkey, 559 So.2d 335 (Fla. 1st DCA 1990) (where defendant in custody, warrantless search of his car known to be on public parking lot proper where probable cause provided by open view of pistol cartridges); State v. Coleman, 502 So.2d 13 (Fla. 4th DCA 1986) (open view of contraband in defendant's car parked on street in front of his residence justified warrantless seizure).
Adding to the exigent circumstances created by the ready mobility of the Renault was the fact that just at the time the police seized the car they knew that Waterman was on his way out the jailhouse door and warned that the police had seen incriminating evidence in his car. Knowing this, the police were justified in believing that the car would soon be moved and the evidence it contained disposed of if they did not act quickly. We reject Waterman's argument that the police "created" the exigent circumstances by informing Waterman of their suspicions about him and delaying his departure from the station house. The police conducted their inquiry in a proper manner, confronting Waterman with their conclusion in an obvious effort to spur a post-Miranda confession. Merely because Waterman rejected this invitation to confess does not deprive the police of the heightened urgency caused by Waterman's imminent release. Waterman was released by the sheriff's deputies interrogating him about the homicide to the custody of the officers to complete the booking procedures on the loitering and prowling arrest. The sheriff's deputies did not know how long the booking procedure would take. But they knew that it probably would not take long and that he was at that moment apprised of their interest in him and the contents of his car. They were justified in their fear that Waterman would move the car out of their reach or have someone else move it.
Because we find the seizure and search sustainable under the automobile exception to the warrant requirement, we need not discuss the state's arguments going to the validity of the warrant itself or the application of the Leon "good faith" exception to the warrant requirement under the instant circumstances.
We turn now to the second issue raised by the state. After gaining further evidence from the searches of the Buick and the Renault, an affidavit and search warrant for Waterman's home was obtained and executed the day following the searches of the cars. Many items not listed in the warrant were seized from Waterman's home. In this appeal the only item suppressed which the state appeals is the paperback novel Post-Mortem.
The book was removed from the shelf in Waterman's home either because of its title or because the search warrant authorized the police to look for fingernails and fibers, items small enough to be secreted within the pages of a book. The officer who saw the book testified that he took it from the shelf mainly because of its title. Once off the shelf, the picture on the front cover of the book interested him because it showed a corpse of a young woman covered by a sheet on an autopsy table. After determining that the book contained no fingernails or fibers the officer continued reading various passages in the book and, after about twenty minutes, came to believe that the plot of this novel paralleled the instant facts in a substantial way, including the use of some uniquely-tied knots. The officer testified that the murder they were investigating might have been a "copy cat" of this book so he seized it. The trial court suppressed the book concluding its seizure went beyond the scope of the warrant *1038 and did not fulfill all the elements of the "plain view" exception to the warrant requirement.
We have carefully considered the record illustrating the circumstances surrounding the seizure of this book and agree with the trial court's legal conclusion on this remaining issue. Although the book was in plain view to the officer who was in a place where he had a right to be, the incriminating nature of this evidence was not readily apparent. See, Neary v. State, 384 So.2d 881 (Fla. 1980) (three conditions necessary to sustain plain view seizure under Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971): (1) police officer must be in a place where he has a lawful right to be; (2) in the course of his presence officer inadvertently comes upon an object which is openly visible; and (3) it must be immediately apparent to the officer that the object constitutes evidence of a crime).
In sum, we affirm on all issues raised by Waterman in his cross-appeal; on the state's direct appeal, we affirm the suppression of the paperback novel but reverse the suppression of the items seized during the search of Waterman's Renault, and remand for this case to move forward.
PATTERSON and ALTENBERND, JJ., concur.
NOTES
[1] Investigators later learned that Waterman worked part-time as a chauffeur for the owner of the Buick.
[2] The search of the Buick is not at issue in this appeal since the owner consented to the search.