524 So.2d 495 (1988)
Kim M. DENTON, Appellant,
v.
STATE of Florida, Appellee.
Raymond Virgil FRITZ, Appellant,
v.
STATE of Florida, Appellee.
Grant DESHOTELS, Appellant
v.
STATE of Florida, Appellee.
Nos. 87-1886, 87-1709 and 87-1816.
District Court of Appeal of Florida, Second District.
May 6, 1988.
Dominic J. Baccarella, Tampa, and Philip S. Greene, Houston, for appellants.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Kim W. Munch, Asst. Atty. Gen., Tampa, for appellee.
CAMPBELL, Judge.
These consolidated appeals resulted from appellants' pleas of nolo contendere to various drug charges below wherein they reserved their right to appeal the denial of their motions to suppress. Their suppression motions alleged illegal searches and *496 seizures which produced the evidence relied upon by the state. We affirm.
The facts before the trial judge on the motions to suppress show that on September 16, 1986, an unnamed individual voluntarily telephoned Corporal Russell of the Hillsborough County Sheriff's Office (HCSO) Narcotics Division. Corporal Russell then met with the individual who advised Corporal Russell that he, the individual, was intimately familiar with and had actively participated in a drug smuggling organization operating in Hillsborough County. The individual informed Corporal Russell that the drug smuggling operation was commanded by Matthew and Grant Deshotels, father and son, and operated between Houston, Texas and Tampa.
The individual further informed Corporal Russell that his active participation in the drug operation had involved transporting approximately 2,700 pounds of marijuana on several trips between Houston and Tampa in January, February and March, 1986, and that he, the individual, had remained in contact with the Deshotelses from March until September, when he had contacted Corporal Russell. The unnamed individual disclosed that the method of operation of the drug smuggling venture was to smuggle marijuana from Houston to Tampa where the Deshotelses then distributed it to particular distributors they had working for them in the Tampa area. Approximate locations and partial names of some distributors were furnished to Corporal Russell, as well as the telephone numbers and present and previous addresses of the Deshotelses.
The information further revealed that the method of operation customarily involved a subject known as "Rock," later identified as appellant Raymond Virgil Fritz, who would accompany the marijuana from Houston to Tampa where it was provided to the Deshotelses on a "front situation." The "front situation" was described as a situation whereby the Deshotelses did not pay for the marijuana at the time they received it, but instead, "Rock" would remain in Tampa while the Deshotelses distributed the marijuana to their distributors and collected the money for it. "Rock" would then take the money and return it to his superiors in Houston. Corporal Russell was furnished a physical description of "Rock."
Based on the information supplied, Corporal Russell, between September 16, 1986 and November 4, 1986, conducted his own investigation to verify the information given by the informant and to obtain further evidence. While during that time, September 16, 1986 to November 4, 1986, Corporal Russell did not uncover any drugs being transported or used, he did verify the residences the informant had described and other addresses, locations, telephone numbers and descriptions of people involved. He made inquiries into and verified information he gained from the Houston, Texas and Louisiana areas. He made periodic checks and surveillances on the people involved.
On approximately November 4, 1986, he discovered that the residence where Grant Deshotels had been living appeared abandoned. He discovered what appeared to him to have been a surreptitious change of residence. Checking through Tampa Electric Company, Corporal Russell found that Grant Deshotels had transferred the utility deposit on the residence in which he had been living to a new address in Deshotels' wife's maiden name, at 11216 Marlborough Drive in Seffner. He also learned that Grant Deshotels had changed residences several times within the year. Corporal Russell then verified that Grant Deshotels' automobiles were at the new residence and began a more continuous, in-depth surveillance of Grant Deshotels' new residence.
As a result of the increased surveillance that began on November 4, 1986, Corporal Russell and the HCSO discovered that a person fitting the description of "Rock" had arrived at and had begun staying at Grant Deshotels' residence. "Rock's" presence confirmed the information Corporal Russell received from the confidential informant on September 16, 1986, that the Deshotelses were in the process of obtaining another load of marijuana, that their Texas connection had informed them another *497 load was forthcoming, that "Rock's" presence would be the link and key indicator of the arrival of the marijuana and that "Rock's" continued presence was indicative that the Deshotelses were in the process of distributing the marijuana.
The confidential informant had also informed Corporal Russell that the Deshotelses preferred to use Pontiac Parisian automobiles in the distribution of the marijuana because of the large trunk capacity of that particular style and make of automobile. Corporal Russell had confirmed that Matthew and Grant Deshotels drove "look-alike" Pontiac Parisians.
On the evening of November 7, 1986, at the end of the fourth day of active surveillance of the Deshotelses and Grant Deshotels' residence, the Deshotelses' normally routine activity began to vary in significant particulars to Corporal Russell. "Rock" was observed at Grant Deshotels' residence. Matthew Deshotels was observed at approximately 4:20 p.m. leaving his residence at 12155 Highway 41 South, in Gibsonton. He was followed to a shopping center in Gibsonton where he went into a supermarket for about twenty minutes. He emerged and placed a brown paper bag in the trunk of the Pontiac Parisian he was driving. He then left the Gibsonton area and drove to his son's Marlborough Drive residence in Seffner. When he entered his son's residence, he was not observed to be carrying anything. After about fifteen minutes, one of the men in the house was observed to leave the house and go to the trunk of Grant Deshotels' Pontiac Parisian, open the trunk and return to the house. It could not be determined whether anything was carried to or taken from the car.
On this night, November 7, 1986, as opposed to other nights during the surveillance, the outside lights were not turned on when the men observed went to and from the cars at Grant Deshotels' residence. At approximately 6:45 p.m., two of the men, who appeared to be Matthew and Grant Deshotels, left the residence and got into the same Pontiac Parisian whose trunk had been opened shortly before. The Pontiac was driven from the Seffner residence and was followed by Corporal Russell and his surveillance team to Interstate 4, west on I-4 to I-75 and then north on I-75, for a total distance of some twelve to fifteen miles. The surveillance team observed that the Deshotelses' automobile was being driven much more cautiously than had been observed previously. It did not exceed forty to forty-five miles per hour on the Interstates. It did not change lanes and made all turns in a noticeably cautious manner. It appeared to the surveillance team that the Deshotelses were proceeding north on I-75 out of Hillsborough County in the direction of Hernando or Pasco County. The information that had been previously furnished to Corporal Russell was that one of the Deshotelses' distributors in the marijuana operation was in the Brooksville area of Hernando County or adjacent Pasco County. When all of this information was furnished by radio to Corporal Russell's immediate supervisor, Corporal Russell was ordered to stop the Deshotelses' car for investigative purposes before it left Hillsborough County. We conclude, as did the trial judge, that at that point in time, Corporal Russell and the surveillance team had demonstrated sufficient evidence of a reasonable, well-founded suspicion that the Deshotelses were committing or about to commit a criminal offense so as to justify the initial investigative stop of their automobile. Kehoe v. State, 521 So.2d 1094 (Fla. 1988); Williams v. State, 454 So.2d 737 (Fla. 2d DCA 1984).
Upon stopping the Deshotelses' vehicle, Corporal Russell identified himself and informed the Deshotelses that he was investigating possible narcotics law violations. Upon being asked to identify themselves, Grant Deshotels stated that he lived in Land O'Lakes in Pasco County and had just driven to Gibsonton to pick up his father and return him to Grant's residence in Pasco County for a fish fry. During that conversation, Matthew Deshotels was nodding his head affirmatively. Corporal Russell, of course, because of his surveillance, knew Grant Deshotels' statements were untrue. Grant Deshotels was also observed attempting to lock his car from the outside with his keys in the ignition. *498 He gave a name and location of the place he said he worked, but was unable to give the names or descriptions of any of his supervisors. A K-9 narcotics detection dog handler was then summoned and arrived in some fifteen to twenty minutes. Upon arriving at the scene, the narcotics detection dog alerted the trunk of the Deshotelses' vehicle by barking and scratching at the trunk. The officers then had probable cause to open and search the trunk, which they did, discovering thirty pounds of marijuana. Based upon the discovery of the marijuana in the trunk of the Deshotelses' vehicle, their previous information derived from the informant, their confirmation of that information and their surveillance, the officers then obtained a search warrant for the Grant Deshotels residence on Marlborough Drive.
While appellants argue on the strength of Rodriguez v. State, 297 So.2d 15 (Fla. 1974) and Hamelmann v. State, 113 So.2d 394 (Fla. 1st DCA 1959), that the information from the informant was too stale to support the searches and seizure, we disagree. The "staleness" argument relates to whether information relied upon to establish probable cause to support a search is too stale to indicate that a crime is being committed or is about to be committed. The "staleness" principle is not fatal to the establishment of a reasonable, well-founded suspicion necessary to support the investigatory stop of a vehicle. See Rodriguez; Williams.
In this case, the question of whether the evidence against appellants should have been suppressed depends upon whether the initial stop of the Deshotelses' vehicle was proper. We have already indicated our conclusion that the stop of the vehicle was proper. Even so, we further observe that this court has held in Smith v. State, 438 So.2d 896 (Fla. 2d DCA 1983) and Hess v. State, 309 So.2d 606 (Fla. 2d DCA 1975), that the question of whether information is too stale to establish probable cause to support a search is not to be determined solely by the rigid application of a pre-determined time period. While the passage of time is an important factor in support of the existence of probable cause, it is not the only factor. Where, as here, there is evidence of an ongoing pattern of criminal activity, an extended lapse of time in and of itself would not preclude a finding of probable cause.
Since we conclude that the stop of the Deshotelses' vehicle was proper, the sequence of events following that stop established probable cause to support a search of the vehicle. The search of the vehicle yielded further evidence which, when coupled with the other information previously available, was sufficient to support the search warrant for the search of Grant Deshotels' residence.
Affirmed.
DANAHY, C.J., and FRANK, J., concur.