842 So.2d 754 (2003)
Darryl MOODY, Appellant,
v.
STATE of Florida, Appellee.
No. SC94435.
Supreme Court of Florida.
January 23, 2003.
Rehearing Denied April 3, 2003.
*755 Robert A. Norgard, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court finding Darryl Moody (Moody) guilty of first-degree murder and imposing a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we reverse the trial court's ruling denying Moody's motion to suppress, vacate the judgment and sentence, and remand for a new trial.

Factual and Procedural Background
On May 16, 1994, Scott Mitchell (Mitchell), the manager of a citrus grove, happened upon a stolen vehicle in a remote area of the grove, and was shot two times in the head with two different guns. Mitchell was found a short time thereafter, still in his vehicle. His wallet, cell phone, and other personal items were still in his vehicle. Mitchell's vehicle was located about fifty feet behind a stripped green Buick. The Buick had been reported stolen. Evidence of dirt behind the wheels of Mitchell's vehicle, and the fact that Mitchell's foot was still on his brake, indicate that Mitchell was attempting to back up quickly when he was fatally shot.
Neither of the murder weapons was found at the scene of the crime, and no latent fingerprints or hair samples were discovered. Tire and shoe imprints were made from impressions found around Mitchell's vehicle. Neighbors indicated they saw a silver or gray Cadillac and a green Buick pass near the scene of the homicide that morning and heard gun shots at some point thereafter. Other witnesses testified that they saw a gray or silver Cadillac and a large green car in the area of the citrus grove, but none were able to positively identify the occupants.
On May 23, 1994, a week after Mitchell was shot, Darryl Moody's vehicle was stopped by police in a high-crime, high-drug-use area. Sergeant Terry Dowdy (Dowdy) testified that on that day he was working undercover and patrolling the area with Investigator Eugene Bly. Dowdy recognized Moody and believed that Moody had a suspended driver's license. Because he was in an unmarked car, Dowdy called a uniformed officer to make a traffic stop. The officers were unable to confirm Moody's driving status before the stop because they needed Moody's date of birth to do so. Once stopped, Dowdy approached Moody and asked him for his driver's license. Moody admitted he did not have one. Moody was arrested and placed in the patrol car.
Officers called a tow truck for Moody's car and conducted a routine inventory search at the scene. A Davis P-380 handgun was found in the car, and Dowdy *756 discovered through the police dispatch that the gun may have been reported stolen, although that information could not be confirmed. Officers confiscated the gun for further investigation. Moody was taken to the police station, issued a citation for driving with a suspended license, and released. The next day, the sheriff's department informed police that the Davis P-380 handgun found in Moody's car was the same gun that was reported stolen from the Buick found at the scene of Mitchell's homicide. The Davis P-380 was not, however, one of the weapons used to shoot Mitchell.
After Moody left the police station, he contacted his friend Bruce Foster and sold Foster a Rossi .38 Special. About a month before the Mitchell murder, Moody had in his possession a .38 revolver handgun at a nightclub, and Foster thought that the gun he was buying was that same handgun. When Moody sold Foster the gun, Moody said that the gun had "been through a lot." After purchasing the Rossi .38, Foster heard on the street that the gun was used to shoot somebody. The Rossi .38 was listed as part of the contents in a rose or pink colored Cadillac reported stolen on April 10, 1994.
On May 24, 1994, the day after the traffic stop and the sale of the Rossi .38 to Foster, Moody was arrested again, this time for possession of a firearm (the Davis P-380) by a convicted felon. This second arrest came after the sheriff's office linked the Davis P-380 found in Moody's car to the stripped green Buick that was found at the scene of the Mitchell homicide. Police then obtained a search warrant for Moody's car and for Moody's house. They also searched, by consent, Moody's girlfriend's sister's house, where Moody sometimes stayed. The probable cause affidavits in support of the applications for the warrants stated that Moody was in possession of the Davis P-380 handgun from the stolen Buick, as well as stereo equipment and other items believed to have been taken from the Buick. Police searched Moody's house, car, and his girlfriend's sister's house, and found certain items matching the description of items reported stolen from the Buick, as well as a pair of Sierra hiking boots. The boots were taken to compare the treads to footprints found at the scene of the homicide.
After Moody's second arrest (for possession of a firearm by a convicted felon), Foster attempted to help Moody get out of jail. He contacted the police, turned in the Rossi .38, and told police he had gotten the gun from some men in a drug deal. Foster indicated he thought this would help Moody. However, after several hours of questioning, Foster eventually told police that he purchased the gun from Moody. The Rossi .38 was one of the handguns used to shoot Mitchell.
The State's theory at trial was that Moody and his brother Dexter Moody were stripping the Buick in a secluded area of a citrus grove when Scott Mitchell came upon them unexpectedly. Mitchell was shot in the head twice by separate guns, and either shot was fatal. The State theorized that the second shot, at close range, came from Moody. Moody was convicted of felony murder and sentenced to death. Dexter Moody was never charged with any crime related to the Mitchell murder.
Moody raises five claims on appeal: the trial court erred in denying his motion to suppress; the State's circumstantial evidence was insufficient to establish his guilt; the trial court erred in allowing an alternate juror to be substituted for a juror who became ill after the jury began deliberations; the State failed to present sufficient evidence that the dominant motive for the murder was to avoid or prevent *757 a lawful arrest and this aggravating factor should be stricken; and the sentence of death is disproportionate. Because we find that the trial court erred in denying Moody's motion to suppress, we do not discuss the other claims.[1]

Motion to Suppress
The State's case against Moody arose out of a traffic stop initiated by Sergeant Dowdy based on Dowdy's belief that Moody did not have a valid driver's license. Following the stop, police discovered a Davis P-380 handgun that linked Moody to the murder crime scene, which in turn led police to search Moody's house, car, and his girlfriend's sister's house. When Moody was arrested for possession of a firearm by a convicted felon, in relation to the Davis P-380 found in his car, Bruce Foster came forward with one of the murder weapons, a Rossi .38, telling the police he got it from Moody.
Moody filed at least three motions to suppress evidence, seeking to exclude the P-380 handgun, bullets, stereo equipment, and items taken from the stolen Buick. He claimed that all of the items were obtained as a result of an illegal traffic stop and were the "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The trial court denied Moody's motion, holding that the initial stop was not an illegal Terry[2] stop because it was not the product of "random or capricious police activity" and was not based on an "inarticulate hunch" or "unparticularized suspicion," all of which Terry condemns. In its sentencing memorandum, the trial court stated that:
In this case, Sgt. Dowdy knew that the Defendant had no license at the time of their last encounter, he knew the Defendant was inclined to drive without lawful authority, and he knew from the common experience that it is unlikely that driving privileges are restored during incarceration. Thus, it was reasonable to be suspicious that the Defendant's driving privileges still had not been restored.
In reaching this conclusion, the trial court relied on cases involving the staleness doctrine which examine the period of time between when an officer has knowledge that a driver has an invalid license and when the stop occurs. See State v. Wade, 673 So.2d 906 (Fla. 3d DCA 1996) (a traffic stop made eleven days after knowledge of suspension was found to be reasonable); State v. Leyva, 599 So.2d 691, 693 (Fla. 3d DCA 1992) (four- to five-week-old "knowledge of defendant's previously suspended driver's license was not stale and provided the officer with a reasonable suspicion upon which to make a valid legal stop"); State v. Carrs, 568 So.2d 120, 120 (Fla. 5th DCA 1990) (predicate knowledge for stop was "two days to a week old"). The trial court also cited to cases from other states involving the same issue. See Stewart v. State, 220 Ga.App. 295, 469 S.E.2d 424 (1996) (no time frame specified, but stop declared legal); State v. Duesterhoeft, 311 N.W.2d 866 (Minn.1981) (stop valid based on knowledge that was one month old); State v. Gibson, 665 P.2d 1302 (Utah 1983) (stop valid based on actual knowledge three months old). Based on these cases, the trial court found there to *758 be no bright-line test for establishing when facts giving rise to a reasonable and articulable suspicion become stale. The court then found that in this case, Dowdy's suspicion was reasonable because the knowledge he had concerning Moody's driving status was not stale. We disagree with the trial court's conclusion that Dowdy's knowledge was not stale.
In reviewing a trial court's ruling on a motion to suppress, appellate courts must accord a presumption of correctness to the trial court's determination of the historical facts, but must independently review mixed questions of law and fact that ultimately determine the constitutional issues arising in the context of the Fourth Amendment. See Connor v. State, 803 So.2d 598, 608 (Fla.2001); Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999); Albritton v. State, 769 So.2d 438 (Fla. 2d DCA 2000). The historical facts in this case are not in dispute.
Dowdy testified at the suppression hearing that he first met Moody in 1987 or 1989. Before the traffic stop on May 23, 1994, it had been a year or two years since Dowdy had any contact with Moody. It may have been as long as three years since Dowdy last checked Moody's driving status. Although Dowdy knew that Moody had been in prison at some time prior to 1994, he did not know exactly when Moody was in prison, for how long, or when Moody was released. Additionally, Moody's prior license suspension was not for a fixed period, and it was possible for Moody to regain a valid license within a few days. Moody could have easily obtained a valid license before Dowdy stopped him on May 23, 1994. Based on these facts, it cannot be said that Dowdy had fresh knowledge concerning Moody or the status of his driver's license at the time of the traffic stop on May 23, 1994. Therefore, upon our independent review of the mixed questions of law and fact that ultimately determine the constitutional issues, we conclude that Dowdy was acting on a hunch or mere suspicion and thus acted illegally in stopping the defendant. Because the information on which Dowdy relied was not fresh, the trial court erred in denying Moody's motion to suppress.
The dissenting opinion of Senior Justice Harding submits that our analysis of the staleness doctrine ignores United States Supreme Court precedent, namely, United States v. Arvizu, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), and United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). That line of cases discusses the necessity that an officer have a reasonable suspicion, under the totality of the circumstances, that criminal activity may be afoot, so as to justify an investigatory stop. The dissent asserts that the totality of the circumstances in this case justified the stop because the officer's experience and knowledge of the defendant and the defendant's driving status evinced an objective manifestation to support the investigatory stop.
While we recognize that the totality of the circumstances may have, at an early point in time, justified the investigatory stop, we also recognize that under the staleness doctrine, justification for an investigatory stop may dissipate with time. When, as in this case, as many as three years passes without any further information about a person's driving status, and when, as in this case, that person's license can be restored through a simple administrative process, the staleness of the officer's information is indeed an important factor in considering the totality of the circumstances showing an objective manifestation to justify the stop. See Denton v. State, 524 So.2d 495 (Fla. 2d DCA 1988) (staleness is an "important factor" in determining *759 probable cause, although not the only factor).
The majority does not ignore Supreme Court precedent; we have considered the totality of the circumstances. Under these circumstances, we find that the information the officer relied upon to justify the investigatory stop was stale and the stop was therefore illegal.
Although the stop was illegal, the fruit of the poisonous tree doctrine does not automatically render any and all evidence inadmissible. A court may admit such evidence if the State can show that (1) an independent source existed for the discovery of the evidence, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); or (2) the evidence would have inevitably been discovered in the course of a legitimate investigation, Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); or (3) sufficient attenuation existed between the challenged evidence and the illegal conduct, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). None of these three exceptions are supported in this record.
First, the State did not argue, nor do we find any evidence in this record to support, an independent source for the discovery of the evidence. What the State did argue was that the Davis P-380, and all of the other evidence, would have inevitably been discovered after Foster turned in the Rossi .38 and told police he bought it from Moody. In making a case for inevitable discovery, the State must show "that at the time of the constitutional violation an investigation was already under way." Nix v. Williams, 467 U.S. 431, 457, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (Stevens, J., concurring). "[I]nevitable discovery involves no speculative elements...." Id. at 444 n. 5, 104 S.Ct. 2501. In other words, the State cannot argue that some possible further investigation would have revealed the evidence. See State v. Duggins, 691 So.2d 566, 568 (Fla. 2d DCA 1997); Bowen v. State, 685 So.2d 942 (Fla. 5th DCA 1996) (holding that speculation may not play a part in the inevitable discovery rule and that the focus must be on demonstrated fact capable of verification). In other words, the case must be in such a posture that the facts already in the possession of the police would have led to this evidence notwithstanding the police misconduct. In this case, however, the police had not initiated any investigation of Moody for the Mitchell murder prior to the traffic stop, and the police had no reason to suspect Moody had any involvement in the murder.
Second, the evidence does not support the application of the inevitable discovery doctrine. It is speculation to argue that once Foster turned in the murder weapon and told the police that Moody sold it to him, the police would have ultimately obtained the search warrants and then discovered the other evidence Moody sought to have suppressed. Foster stated that when Moody sold him the Rossi .38, Moody was concerned about the P-380 that the police found in his car. Had Moody not been illegally stopped, we cannot say that it was inevitable that the police would have found the P-380, that Moody would have become concerned about the weapons and sold Foster the Rossi .38, or that Foster would have turned the weapon in to police. The illegal stop and Moody's initial arrest set in motion an unbroken chain of events, which included the discovery of the P-380, Moody's sale of the Rossi .38 to Foster, a second arrest for possession of a firearm by a convicted felon, Foster's attempt to help get Moody out of jail for the second arrest by turning in the Rossi .38 to police, and the search of the several residences. *760 These events were the result of the initial stop, and nothing in this record demonstrates that the State would have inevitably discovered any of the evidence Moody sought to suppress.
Finally, the record demonstrates that the evidence was not sufficiently attenuated. At the first suppression hearing, the State mentioned that there were issues of attenuation but did not develop this argument in any detail. In order to determine if evidence is sufficiently attenuated, the court must consider three factors: (1) the temporal proximity of the arrest and the discovery of the evidence sought to be suppressed; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the police misconduct. Walker v. State, 741 So.2d 1144 (Fla. 4th DCA 1999) (citing Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).
The temporal proximity of the arrest and the discovery of the evidence sought to be suppressed was immediate. In fact, the initial stop of Moody and the discovery of the Davis P-380 handgun occurred contemporaneously. The officers discovered the gun at the scene of the stop while Moody was sitting in the back seat of the patrol car.
Furthermore, there were no intervening circumstances between the stop and the discovery of the handgun. The chain of events, beginning with the stop and ending with the discovery of the gun and other equipment in Moody's car, was not interrupted by any superseding event.
This record contains limited information concerning the purpose and flagrancy of the police misconduct. Dowdy testified at the suppression hearing that he had heard of the murder but had no reason to believe that Moody was involved until the day after the arrest when the sheriff's department contacted him about the P-380 hand-gun. That information then linked Moody to the crime scene. In fact, when Dowdy called in the serial number of the gun to headquarters, the serial number came up with a "hit," meaning the gun had been reported stolen, but headquarters indicated the gun was a .38, not a P-380. Dowdy could not confirm at the time of the initial stop and arrest whether the gun was in fact stolen. Thus, Moody was booked and released with a citation, the equivalent of a notice to appear. There is no evidence that the officers had a motive for stopping Moody, other than to determine the status of his driver's license. Based on these facts, it cannot be said that the discovery of the evidence was attenuated from the initial police misconduct, i.e., the illegal stop.
Because the record in this case does not support an exception to the fruit of the poisonous tree doctrine, the motion to suppress the evidence obtained as a result of the illegal Terry stop should have been granted.

Conclusion
The traffic stop of Moody was unlawful because it was not based on a reasonable suspicion. Because the State has failed to demonstrate any exception to the exclusionary rule, the fruits of that unlawful stop, should have been suppressed. We therefore reverse the trial court's order denying Moody's motion to suppress, vacate the judgment and sentence, and remand for a new trial consistent with this opinion.
It is so ordered.
ANSTEAD, C.J., PARIENTE, LEWIS, and QUINCE, JJ., and SHAW, Senior Justice, concur.
WELLS, J., dissents with an opinion, in which HARDING, Senior Justice, concurs.
*761 HARDING, Senior Justice, dissents with an opinion, in which WELLS, J., concurs.
WELLS, J., dissenting.
I dissent because I believe that the exclusion of this evidence extends the exclusionary rule too far.
The majority cites no case in support of its conclusion that the suspicions of the police officer were so unreasonable that this evidence has to be suppressed as a deterrent to police misconduct. To the contrary, this was a police officer who had checked the driver license status of the defendant in the past. He never knew the defendant to have anything but a suspended license. It is my view that what would have been unreasonable and a neglect of duty would have been for this officer not to check on the status of the defendant's driver license.
I believe the majority is in serious error in reversing this murder conviction on such a basis.
HARDING, Senior Justice, concurs.
HARDING, Senior Justice, dissenting.
I dissent because I believe the majority fails to employ the correct analysis in evaluating whether the officer's action in stopping the defendant's vehicle in this case was supported by reasonable suspicion. Recently, in United States v. Arvizu, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), the United States Supreme Court stated the following:
When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. See, e.g., id., at 417-418, 101 S.Ct. 690. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Id. at 418, 101 S.Ct. 690. See also Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere "`hunch'" is insufficient to justify a stop, Terry, supra, at 27, 88 S.Ct. 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, [U.S. v.] Sokolow, supra, [490 U.S. 1] at 7, 109 S.Ct. 1581 [104 L.Ed.2d 1].
Our cases have recognized that the concept of reasonable suspicion is somewhat abstract. Ornelas, supra, at 696, 116 S.Ct. 1657 (principle of reasonable suspicion is not a "`finely-tuned standar[d]'"); Cortez, supra, at 417, 101 S.Ct. 690 (the cause "sufficient to authorize police to stop a person" is an "elusive concept"). But we have deliberately avoided reducing it to "`a neat set of legal rules,'" Ornelas, supra, at 695-696, 116 S.Ct. 1657 (quoting Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).
Id. at 273-74, 122 S.Ct. 744 (emphasis added). Moreover, in United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the U.S. Supreme Court stated that an investigatory stop is justified if there is "some objective manifestation " that the person about to be stopped is engaged in unlawful activity. Id. at 417, 101 S.Ct. 690 (emphasis added).
*762 In this case, however, the majority fails to engage in any "totality of the circumstances" analysis, nor does it consider whether there was any "particularized and objective basis" or "objective manifestation" for the officer to reasonably suspect that Moody might be driving with a suspended license. Furthermore, the majority neglects to recognize that, as the U.S. Supreme Court has articulated, this process allows for officers to draw on their experience to make inferences from and deductions about the cumulative information available to them. Instead, the majority opts for examination of whether the officer in this case had "fresh knowledge," to conclude, without citation to any authority from this State or any other, that the trial court erred in finding that the officer stopped the defendant based on a reasonable suspicion. Based on Arvizu, however, this is clearly a flawed approach.
In the instant case, it was clearly evinced at trial that the stop was based on the following information: The officer knew the defendant for a period of at least four, and possibly six, years prior to the stop; ever since the officer knew the defendant, he knew the defendant to have had a suspended driver's license; during this period, the officer had occasion to check the defendant's records; court records reflected that defendant's driver's license had expired in 1977 and then was suspended since 1984 or 1985, when the defendant had pled guilty or no contest to the charge of driving with a suspended license; the officer knew that the defendant had no license at the time of their last encounter; and the officer knew that the defendant was recently incarcerated and it was common knowledge that driving privileges are not restored during incarceration.
It was based on this experience with (and resulting knowledge of) the defendant that the officer, upon recognizing the defendant and observing him driving an automobile, called for a marked patrol car to stop defendant on the suspicion that he was driving with a suspended license. Therefore, in applying the above standards to the present case, it cannot be said that the totality of the circumstances of the officer's actions did not evince some objective manifestation to support the officer's suspicion that the defendant may have been driving with a suspended license. And notwithstanding whether the officer had seen the defendant in a year or two since his last encounter, the officer's actions in the present case are exactly in line with those allowed by the U.S. Supreme Court, i.e., he relied on his experience to make a reasonable inference from the cumulative information available to him. This qualitative analysis also appears much more logical and workable than the mechanical quantitative measurement of time as proposed by the majority.[3]
This case is much different from the situation in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), where the U.S. Supreme Court found an investigatory stop of a motorist to be without "at least articulable and reasonable *763 suspicion that a motorist is unlicensed." Id. at 663, 99 S.Ct. 1391. Unlike the stop in the instant case, the stop in Prouse was made randomly and at the officer's complete and unbridled discretion, without any previously specified, neutral criteria. See id. As the Court stated, the random stop was the "kind of standardless and unconstrained discretion [that] is the evil the Court has discerned in previous cases." Id. at 661, 99 S.Ct. 1391. We do not have those circumstances here.
Therefore, based on the totality of the circumstances presented in this case, I would find that the traffic stop in this case was indeed based on an articulable and reasonable suspicion, and I would thus affirm the trial court's order denying the defendant's motion to suppress the handguns and other evidence implicating him as the murderer of the victim in this case. Accordingly, I would also affirm the defendant's convictions and the trial court's sentence of death.
WELLS, J., concurs.
NOTES
[1] The trial court properly denied Moody's motion for judgment of acquittal because the evidence submitted to the jury was sufficient to sustain the conviction. See Lewis v. State, 754 So.2d 897 (Fla. 1st DCA 2000) (when considering whether evidence is sufficient to support a conviction, the reviewing court considers all evidence at trial, including evidence erroneously admitted).
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] This more qualitative approach also is consistent with Denton v. State, 524 So.2d 495 (Fla. 2d DCA 1988), where the Second District stated:

The "staleness" argument relates to whether information relied upon to establish probable cause to support a search is too stale to indicate that a crime is being committed or is about to be committed. The "staleness" principle is not fatal to the establishment of a reasonable, well-founded suspicion necessary to support the investigatory stop of a vehicle.
Id. at 498. Therefore, as the Denton court recognized, "staleness" appears to be, at most, only a factor in the "totality of the circumstances" analysis of whether a stop was based upon reasonable suspicion.