NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

MICHAEL RODGERS,                            )
                                            )
            Appellant,                      )
                                            )
v.                                          )        Case No.  2D16-4366
                                            )
STATE OF FLORIDA,                           )
                                            )
            Appellee.                       )
                                            )
_____)

Opinion filed February 20, 2019.

Appeal from the Circuit Court for
Hillsborough County; Christopher C.
Sabella, Judge.

Howard L. Dimmig, II, Public Defender,
and Timothy J. Ferreri, Assistant Public
Defender, Bartow, for Appellant.

Ashley Moody, Attorney General,
Tallahassee, and John M. Klawikofsky,
Assistant Attorney General, Tampa,
for Appellee.


SILBERMAN, Judge.

          Michael Rodgers seeks review of his judgment and sentences for twenty

counts of possession of child pornography.  Rodgers entered a plea to the charges

while reserving the right to appeal the denial of his dispositive motion to suppress.

Rodgers argues that the police exceeded the scope of the search warrant by entering a

recreational vehicle (RV) that was located on property at the given address but not separately identified in the warrant. We agree and reverse.

The special agent who applied for the search warrant testified that he had information that someone with a specific internet protocol (IP) address was sharing child pornography. His surveillance and investigation led him to believe the property associated with the IP address consisted of a house located on three or four acres of land. Because the house is situated far from the road he could not see what was on the land behind it. He thought multiple occupants were living on the property, but he was not sure how many.

The search warrant listed the address of the premises and described the premises as "a single story, block residence." The warrant authorized the police "to enter and search 'the Premises' aforesaid and curtilage thereof, and any vehicles thereon, or any persons located on 'the Premises' or within the curtilage reasonably believed to be connected with said illegal activity."

The special agent testified that when the police entered the property, they discovered a detached mother-in-law suite behind the main house and several RVs behind that. One of the RVs had an Indiana license plate registered to Rodgers. The interior was blocked from view by shades on the windows. The RV had an attached awning affixed to the ground and a septic connection to the ground. A router cable ran "from the main portions of the residence to the RV." The special agent admitted he did not have specific information regarding which structure on the property was accessing the IP address that was the basis for the warrant. He later found out, after the warrant was executed, that Rodgers' RV was accessing utilities, including the internet.

As to Rodgers' RV, when the warrant was executed one of the entry teams knocked on the door of his RV and announced that they had a warrant. Rodgers answered through a window and contested the officers' authority to enter. The police told Rodgers to come outside for officer safety, but he did not comply and disappeared from view. The police then heard a "commotion" in the RV, described as "unidentifiable noises." Although the police did not hear any voices other than Rodgers', they forced entry into the RV out of a concern that either someone else was inside or Rodgers might "retrieve some sort of weapon." They immediately located Rodgers in the main living area and escorted him outside. A sweep of the bedroom and bathroom revealed that Rodgers had been alone. It also revealed a computer broken into pieces underneath the bed. The team did not seize the computer but called for the special agent.

At that time, the special agent was speaking with the property owner. The property owner told the special agent that Rodgers had been living on his property in the RV for the past five years. Rodgers paid monthly rent and had access to utilities including electric, water, and internet. However, the testimony did not establish that the police had this information before they entered Rodgers' RV. But after talking with the property owner, the police obtained a separate search warrant for Rodgers' RV. They seized the computer during the subsequent search.

The dispositive issue on appeal is whether the original entry into Rodgers' RV was within the scope of the first warrant. "The authority to search pursuant to a warrant is limited to the place described in the warrant, and the description must be sufficiently particularized to lead the searching officers to the place intended." Carr v.

- 3 -

State, 529 So. 2d 805, 806 (Fla. 1st DCA 1988). A warrant that authorizes the search of a residence and its curtilage includes structures found within the curtilage, such as a shed used in connection with the residence. See Antone v. State, 382 So. 2d 1205, 1212 (Fla. 1980).

However, officers are not authorized to search a separate dwelling unit that exists on the premises but is not separately identified in the warrant. See Maryland v. Garrison, 480 U.S. 79, 86 (1987); State v. McKewen, 710 So. 2d 638, 639 (Fla. 5th DCA 1998); Merrick v. State, 338 So. 2d 77, 78 (Fla. 4th DCA 1976). As for RVs, the key issue is whether it is apparent that an RV located on the curtilage is being used as a residence. See United States v. Briscoe, No. 16-10155-EFM, 2017 WL 1908594, at *6 (D. Kan. May 10, 2017), clarified on denial of reconsideration by No. 16-10155-EFM, 2017 WL 2591633 (D. Kan. June 15, 2017); United States v. Kinney, No. 4:05CR00280ERW, 2005 WL 3213909, at *2 (E.D. Mo. Nov. 30, 2005); State v. Martini, 799 P.2d 184, 186 (Or. Ct. App. 1990). Courts consider a myriad of factors in analyzing the issue including the exact location of the RV, whether it is owned by the homeowner or a third party, whether it is affixed to the ground or appears to be readily mobile, whether it has utility hook-ups connected to the main residence, whether it is occupied at the time the warrant is executed, and whether the police had previously been informed that the RV is being used as a separate residence. See Briscoe, 2017 WL 1908594, at *6; Kinney, 2005 WL 3213909, at *2; Martini, 799 P.2d at 186.

On one end of the spectrum is Kinney in which it was not apparent that the RV was being used as a residence. 2005 WL 3213909, at *2. The RV was located inside a unit of "a commercial building not regularly used for residential purposes which

- 4 -

had one glass door entrance and one rolling, garage-type door entrance." Id. There was no mention of it being occupied at the time the warrant was executed. The court held that the RV was a "vehicle" within the scope of the warrant because it was readily capable of being driven on the highway and found stationary in a place not generally used as either a temporary or permanent residence. Id. (citing California v. Carney, 471 U.S. 386 (1985)); see also United States v. Noriega, 990 F.2d 1264, 1993 WL 83508, at *1-3 (9th Cir. 1993) (unpublished opinion) (upholding the search of a motor home in the bay of a garage under a warrant for a business address when the police were told it was used for storage and had not been moved for some time).

On the other end of the spectrum is Briscoe, in which it was known to police that the RV was being used as a residence. 2017 WL 1908594, at *1. The RV was parked ten to fifteen feet behind the main residence, and the police were aware it was being occupied by the residence owner's associates. Id. Moreover, the defendants were not at the wheel of the RV when the officers executed the warrant; instead, they were asleep in a bed inside the RV. Id. at *6. The court concluded that under these circumstances the "[d]efendants had a reasonable expectation of privacy in the RV." Id.

In between the two extremes are Heffernan v. State, 385 So. 2d 1060 (Fla. 4th DCA 1980), and Martini. In Heffernan, the RV was a collapsible pop-up trailer parked next to the residence and registered in the homeowner's name. 385 So. 2d at 1061. While it was hooked up to the home's electricity and water, it was apparently unoccupied when the warrant was executed. The Fourth District held that the search of the trailer was within the scope of the warrant as it was a vehicle located on the curtilage and owned by the occupant of the residence. Id.

In Martini, the travel trailer was located about twenty-five feet south of the main clubhouse. 799 P.2d at 185. It was also connected to the clubhouse by an electrical extension cord. There was a dog tied to the door, and the defendant identified the trailer as his. Additionally, the police had learned there were several travel trailers on the premises prior to executing the search but had not included those trailers in the warrant. The court of appeals concluded that "it seemed reasonably clear that the clubhouse and travel trailer were separate residences." Id. at 186.

The facts in this case are closer to Martini than Heffernan. Unlike in Heffernan, the police did not find an unoccupied pop-up trailer registered in the name of the homeowner. Instead, they found a full-size RV registered to and occupied by a third party who contested the officers' right to enter. Additionally, the RV had an awning and a septic line affixed to the ground, and it was connected to the main house by a router cable. The interior was also blocked from view by shades on all the windows. From this evidence, the police should have known that the RV was being used as a separate residence. Accordingly, the search of the RV exceeded the scope of the warrant.

We reject the State's argument that the officers' search was nonetheless authorized as a protective sweep. See Vasquez v. State, 870 So. 2d 26, 31 (Fla. 2d DCA 2003) (holding that a protective sweep of a residence is not authorized without a separate, lawful basis for entry). We also reject the State's argument that suppression was not required under the good faith exception to the warrant requirement. See Briscoe, 2017 WL 1908594, at *6 (rejecting the application of the good faith exception when officers should have known that a separate structure not listed on the warrant was inhabited); see also State v. Johnson, 605 So. 2d 545, 549 (Fla. 2d DCA 1992)

(declining to apply the good faith exception when the police exceeded the scope of the warrant during its execution because the exception "only applies where the officers act in an objectively reasonable fashion in executing a search warrant that is subsequently found invalid"). But see United States v. Houck, 888 F.3d 957, 960 (8th Cir. 2018) (applying the good faith exception to "conclude that the officers made, at most, an 'honest mistake' in interpreting the warrant to include the RV").

Finally, we do not agree with the dissent's conclusion that Rodgers' convictions may be affirmed under the inevitable discovery doctrine. The inevitable discovery rule requires that there is "a 'reasonable probability' that the evidence would have been discovered despite the improper police procedure." Rodriguez v. State, 187 So. 3d 841, 846 (Fla. 2015) (quoting United States v. Brookins, 614 F.2d 1037, 1042 (5th Cir. 1980)). Moreover, "the investigation must be ongoing and the State must show that the facts known by the police at the moment of the unconstitutional procedure would have led to the evidence notwithstanding the police misconduct." Id. (emphasis added).

In Rodriguez, the supreme court addressed the question of whether this standard is met upon a showing "that the police were in the process of obtaining a warrant prior to the misconduct or whether the prosecution need only establish that a warrant could have been obtained with the information available prior to the misconduct." Id. at 849. The court expressly concluded that the police had to be in the process of obtaining a warrant prior to the misconduct. The court explained that the alternative option "would effectively nullify the requirement of a search warrant under the Fourth Amendment." Id. at 850.

- 7 -

The Rodriguez court emphasized that "a person should enjoy the highest reasonable expectation of privacy" when the sanctity of a home is involved. Id. at 849. Indeed, the court recognized that even if the police had information leading to the evidence before their improper entry into the home, the failure to pursue a warrant leads to the conclusion that "the discovery was not inevitable notwithstanding the police misconduct, and the rule cannot be applied." Id. The existence of probable cause does not "obviate the requirement to pursue a search warrant." Id. Any other result would "eliminate the role of the magistrate and replace judicial reasoning with the current sense impression of police officers." Id.

Simply put, the inevitable discovery doctrine does not apply because there was no evidence that the police were actively pursuing a search warrant for the RV at the time of the illegal entry into Rodgers' RV. Id. at 849; see also Perez v. State, 43 Fla. L. Weekly D2404, D2406 (Fla. 2d DCA Oct. 26, 2018) (holding that the inevitable discovery doctrine did not apply to support the admission of videos obtained from a laptop computer even though the police had probable cause to obtain a search warrant when the police were not actively pursuing a search warrant); Clayton v. State, 252 So. 3d 827, 829-31 (Fla. 1st DCA 2018) (holding that the inevitable discovery doctrine did not apply to evidence of indoor marijuana cultivation found in a home despite the fact that the officers had probable cause to obtain a search warrant because the officers had not been in the process of doing so).

We do not agree with the dissent that this case is distinguishable from Rodriguez and its progeny because the officers herein had already obtained a search warrant to enter the premises on which Rodgers' RV was located. It is not the entry

- 8 -

onto the premises described in the warrant that was illegal; it is the entry into the RV that Rodgers was using as a home that was illegal. While the officers had obtained a search warrant for the premises, the RV <u>was not within the scope of this warrant</u>. Indeed, the police appeared to recognize as much because they did in fact obtain a search warrant for the RV after the illegal entry and their resulting discovery of the computer inside the RV.

We also do not agree that "it was reasonably unclear to the officers that the first warrant did not authorize entry into the RV." Rodgers disputed the officers' authority to enter as soon as the first warrant was produced, and the officer who entered testified that he did so for the purpose of securing the premises rather than any belief that the first warrant authorized the entry. And as addressed earlier, under the circumstances entry to secure the premises was not permissible.

For the foregoing reasons, the search of the RV was not within the scope of the warrant. Accordingly, the trial court erred in denying Rodgers' motion to suppress. We therefore reverse Rodgers' judgment and sentences.

Reversed.


ROTHSTEIN-YOUAKIM, J., Concurs.

SLEET, J., Concurs in part and dissents in part with opinion.

SLEET, Judge, Concurring in part and dissenting in part.

I concur fully in the majority's well-reasoned analysis and conclusion that the first search warrant did not authorize the search of Rodgers' RV. However, I respectfully dissent from its decision to reverse Rodgers' twenty convictions for possession of child pornography. The officers' discovery of Rodgers' laptop and the pornographic images thereon was inevitable based on his shared internet connection and IP address with the main residence and the second warrant obtained by police to lawfully search Rodgers' RV. Accordingly, I would affirm Rodgers' convictions and sentences and the order denying his motion to suppress.

Initially, I recognize that the State has not raised application of the inevitable discovery doctrine. And "[g]enerally, if a claim is not raised in the trial court, it will not be considered on appeal." Robertson v. State, 829 So. 2d 901, 906 (Fla. 2002) (alteration in original) (quoting Dade Cty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644 (Fla. 1999)). Nevertheless, under the "tipsy coachman" doctrine, "a trial court's ruling must be affirmed where the record supports any legal basis for the judgment." State v. Hankerson, 65 So. 3d 502, 505 (Fla. 2011); see also Applegate v. Barnett Bank, 377 So. 2d 1150, 1152 (Fla. 1979) ("The written final judgment by the trial court could well be wrong in its reasoning, but the decision of the trial court is primarily what matters, not the reasoning used. Even when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an alternative theory supports it."). Because the record evidence supports a conclusion that the laptop "would have inevitably been discovered in the course of a legitimate investigation," Rodriguez v. State, 187 So. 3d 841, 845 (Fla. 2015) (quoting Moody v.

- 10 -

State, 842 So. 2d 754, 759 (Fla. 2003)), I would affirm Rodgers' convictions and sentences on appeal.  See Robertson, 829 So. 2d at 906 ("[T]he 'tipsy coachman' doctrine[] allows an appellate court to affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.' " (quoting Radio Station WQBA, 731 So. 2d at 644–45)); State Farm Fire & Cas. Co. v. Levine, 837 So. 2d 363, 365 (Fla. 2002) ("[T]he key to applying the tipsy coachman doctrine is that the record before the trial court must support the alternative theory or principle of law.").

The inevitable discovery doctrine is an exception to the exclusionary rule, which states that "evidence obtained as the result of unconstitutional police procedure may still be admissible provided the evidence would ultimately have been discovered by legal means."  Clayton v. State, 252 So. 3d 827, 830 (Fla. 1st DCA 2018) (quoting Maulden v. State, 617 So. 2d 298, 301 (Fla. 1993)).  "The purpose of the exclusionary rule is to sufficiently deter deliberate police misconduct;" however this exception recognizes that "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial."  Rodriguez, 187 So. 3d at 845 (quoting Fitzpatrick v. State, 900 So. 2d 495, 514 (Fla. 2005)).  Application of the inevitable discovery exception "first requires a 'reasonable probability' that the evidence would have been discovered despite the improper police procedure."  Id. at 846.  Second, the rule requires the State to "demonstrate that at the time of the constitutional violation an investigation was already under way.  In other words, the case must be in such a posture that the facts already in the possession of the police

would have led to this evidence notwithstanding the police misconduct." Id. at 845–46 (citations omitted) (quoting Fitzpatrick, 900 So. 2d at 514).

Here, the police obtained an initial search warrant from a neutral magistrate and were lawfully on the described premises conducting a search when they discovered that a previously unknown residence, Rodgers' RV, shared an internet connection with the main residence described in the warrant. Rodgers had already been identified as a resident of the property in the affidavit that formed the basis for the first search warrant; however, police did not realize that he lived in a separate RV unit until they were on the property conducting the search. The special agent in charge of the investigation testified at the suppression hearing that despite conducting surveillance and a police flyover of the property, police were unable to clearly see the back portion of the property where Rodgers' RV was located because of tree cover and the location of the primary residence, which blocked a view of the RV from the public road. Once police were on the property and observed the cable connecting Rodgers' RV to the internet router in the main residence, they were able to conclude that Rodgers was using the same IP address from his RV that police had discovered was offering to share child pornography. This additional information standing alone was sufficient to support the second search warrant that authorized the search of Rodgers' RV. See State v. Hood, 68 So. 3d 392, 395 (Fla. 2d DCA 2011) ("[T]he inclusion of illegally obtained evidence in a supporting affidavit does not automatically invalidate the resulting search warrant. Instead, the court must excise the invalid allegations from the affidavit and determine whether sufficient valid allegations remain to support a finding of probable cause. If so, the search warrant is still valid." (citations omitted)); State v.

- 12 -

<u>Hunwick</u>, 434 So. 2d 1000, 1001 (Fla. 4th DCA 1983) ("The inclusion of illegally obtained evidence in the supporting affidavit, where the affidavit contains other valid allegations sufficient to establish probable cause, does not invalidate a search warrant." (citing <u>Neary v. State</u>, 384 So. 2d 881 (Fla. 1980))).

The majority notes that the special agent in charge "admitted" that the police did not have any evidence that Rodgers' RV shared the suspect IP address at the time of the first search warrant and implies that therefore police did not have probable cause to obtain a search warrant of Rodgers' RV at the time they entered the RV.  I disagree.  Once police entered the property they observed a router cable strung from the main router of the residence to Rodgers' RV and learned from the residence owner that Rodgers had been accessing the internet for years.[1]  This established probable cause and that is all that is required under the law.  <u>See</u> <u>Schmitt v. State</u>, 590 So. 2d 404, 409 (Fla. 1991) ("[W]e have defined 'probable cause' as a reasonable ground of suspicion supported by circumstances sufficiently strong to warrant a cautious person in the belief that the person is guilty of the offense charged.").

---

[1]An Internet Service Provider (ISP) assigns a single, unique IP address to a router; therefore any computer accessing the same router would share a single IP address.  <u>See generally</u> Tim Lachance, <u>"IP" So Facto? Not So Fasto: Why IP Addresses Should Not Be Considered PII</u>, 58 IDEA 303, 307 (2018) ("[U]tilizing [Network Address Translation] a customer can connect multiple devices to the internet through a central router using a single IP address.  When this protocol is used, the IP address that is transmitted through the internet does not identify the single machine being used, but rather the router through which that machine is connected to the internet."); Paul Ham, <u>Warrantless Search and Seizure of E-Mail and Methods of Panoptical Prophylaxis</u>, B.C. Intell. Prop. & Tech. F., May 2008, at 14 ("An ISP assigns a unique IP [address] . . .  to the router.  Any computer that accesses the Internet through that router then assumes the single IP address of the router.  Through this IP [address], someone can request from an ISP the identity of the subscriber who owns the router—but potentially not the identity of all the users who access the Internet through the router.").

- 13 -

Based on the record in this case, I conclude that police discovery of the partially destroyed laptop was inevitable. There was a reasonable probability that police would have sought and obtained the second warrant authorizing a search of Rodgers' RV based on the shared IP address and without the additional evidence found after unlawfully entering the structure. And there is no question that police were already in the process of conducting an investigation into the IP address associated with the subject property. Police already had a warrant to search the primary residence and knew that Rodgers shared an address with the primary residence. Accordingly, I believe that the pornographic images on the laptop were admissible under the inevitable discovery doctrine.

Recently, in cases where police had probable cause to procure a warrant but failed to do so, the Florida Supreme Court has additionally required the State show that a search warrant was being actively pursued prior to the occurrence of the illegal police conduct in order to satisfy the second prong of the inevitable discovery doctrine, which requires that the State "demonstrate an active and independent investigation." Rodriguez, 187 So. 3d at 848; see also Clayton, 252 So. 3d at 831 ("[I]nevitable discovery supports admission of illegally obtained evidence only when police actively sought to obtain a search warrant before searching a home."). The justification for this additional requirement was aptly explained by the First District in Clayton:

> If the inevitable discovery doctrine were applied this way, any time police have probable cause to search a home, they could do so without seeking a search warrant and the State would be permitted to introduce evidence seized in such a search by asserting that the evidence would have been discovered inevitably. Such a rule would eviscerate the warrant requirement.

- 14 -

252 So. 3d at 831; see also Rodriguez, 187 So. 3d at 850; Young v. State, 207 So. 3d 267, 270 (Fla. 2d DCA 2016); Rowell v. State, 83 So. 3d 990, 995 (Fla. 4th DCA 2012) ("[T]he inevitable discovery doctrine will not be applied in every case where the police had probable cause for a search warrant, but failed to get one." (quoting McDonnell v. State, 981 So. 2d 585, 593 (Fla. 1st DCA 2008))).

In Rodriguez, the supreme court considered a situation where police, who had probable cause to believe that the defendant was growing marijuana in his home, chose to seek voluntary consent instead of pursuing a warrant. 187 So. 3d at 844. The trial court concluded that the consent to search was involuntary, and the supreme court held that the inevitable discovery doctrine did not apply, explaining that "[w]ith no valid consent, and no pursuit of a search warrant, there are no legal means present that would have led to the evidence." Id. at 849. Because police in this case had a warrant and were in the process of conducting an investigation into the suspect IP address—which led to their discovery that Rodgers had access to the main residence's router independent of the unlawful search—this case is distinguishable from the situation described in Rodriguez.

This is not a case "where the police had probable cause to obtain a warrant but simply failed to get one." See Rodriguez, 187 So. 3d at 850. The record demonstrates that the unlawful entry into Rodgers' RV happened simultaneously with the investigation into the router cable and Rodgers' access to the suspect IP address. Indeed, the special agent in charge testified that he observed the internet cable running to the RV and learned from the owner of the residence that it was connected to the router in the primary residence before he became aware of the RV search or the

- 15 -

disabled laptop.  This evidence inevitably would have led police to obtain the second warrant regardless of the warrantless entry or discovery of the laptop.  See, e.g., Craig v. State, 510 So. 2d 857, 863 (Fla. 1987) (holding that evidence was admissible when it "would have been found independently even without the [unlawful police conduct] by means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure").  I do not read the holding of Rodriguez to require that officers be in the process of obtaining a second warrant at the time of a warrantless search in order for the inevitable discovery doctrine to apply.  The warrant requirement outlined in Rodriguez was satisfied by the fact that the officers in this case had already obtained the first warrant prior to searching Rodgers' residence.

The inevitable discovery doctrine "balance[s] the need to deter police misconduct with the societal cost of allowing obviously guilty persons to go free." Rodriguez, 187 So. 3d at 845 (citing Nix v. Williams, 467 U.S. 431, 443 (1984)).  In this case, the police misconduct was neither especially deliberate nor egregious.  When the police initially entered the property and discovered the additional structures, they made a decision to execute a coordinated, simultaneous search of all of the structures including the main residence described in the search warrant.  Police initially made contact with Rodgers and asked him to come outside the RV for officer safety.  After Rodgers retreated beyond the officers' line of sight, the officers heard a commotion that they described as a "rattling, banging and stuff like that."  Concerned that Rodgers was "going back to retrieve some sort of weapon" and that someone else may be inside his RV, the police decided to make a forced entry into his RV.  Once Rodgers was removed from the RV, an officer reentered the RV to check for other occupants.  The unrefuted

- 16 -

testimony of the officer who conducted the search was that he only looked in places where another individual could be hiding; he did not search compartments, desks, drawers, or other areas which might have contained contraband related to this offense. When the officer searched the bedroom, he found a "bed elevated enough for a person to fit underneath there so I briefly looked under the bed with my gun drawn and the light on my gun to see if there was anybody underneath the bed." He did not find anyone else in the RV, but he did see a broken computer under the bed. Without touching or searching the computer, the officer exited the RV and informed his supervisor. Police abated the search until they received the second warrant based on the discovery of the computer, the internet router connection between Rodgers' RV and the main residence, and Rodgers' status as a tenant on the property who paid rent and shared utilities with the main residence.[2] Although the entry into the RV was unlawful, it happened at a time when it was reasonably unclear to the officers that the first warrant did not authorize entry into the RV and their search was substantially limited in scope. When the officers realized that the RV was a personal residence, they obtained the second warrant before reentering and removing the laptop.

Because I conclude that if the police had not discovered the broken computer during the initial sweep of Rodgers' RV, they inevitably would have pursued and obtained the second search warrant based on the discovery that Rodgers was using the same suspect IP address as the main residence, I would affirm his convictions and sentences.

---

[2]The special agent in charge testified that he did not believe he needed the second warrant to search the RV until he realized that it was being used as a separate residence.