# IN THE SUPREME COURT OF IOWA

No. 21–1147

Submitted September 15, 2022—Filed October 28, 2022

**STATE OF IOWA,**

    Appellee,

vs.

**MAURICE EDWARD SALLIS,**

    Appellant.

---

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt (suppression and limited appearance hearings), George L. Stigler (limited appearance hearing), and David P. Odekirk (trial), Judges.

A criminal defendant who was represented by appointed counsel appeals, challenging the denial of his motion to suppress, the refusal of the trial court to permit a retained attorney to enter a limited appearance on his behalf, and the denial of a mistrial based on alleged prosecutorial misconduct. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Timothy M. Hau (argued), Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This drug case requires us to decide whether an officer's recollection that a motorist had a driving status of "barred" as of several months before amounted to reasonable suspicion to justify a traffic stop. We are also called upon to address the extent to which trial courts may regulate limited appearances of retained counsel in cases with appointed counsel.

An officer pulled over the defendant's vehicle. The officer had checked the defendant's driver's license status two to six months earlier and determined it was barred, but he did not recheck that status before making the stop. Cocaine was found, and the driver was determined to be under the influence; he was charged with several offenses. Because of his indigency, the defendant received appointed counsel. Later, during the lengthy pretrial proceedings, a retained attorney sought to enter two limited appearances for certain pretrial matters, without getting involved in the trial itself. The district court refused to allow these limited appearances. The court also overruled the defendant's motion to suppress.

Following a trial in which he was represented by appointed counsel, the defendant was convicted of all charges. On appeal, the defendant asserts error in the denial of his motion to suppress and the denial of his retained attorney's requests to enter limited appearances.

On our review, we disagree. The officer's information about the defendant's driver's license status, although several months old, gave the officer reasonable

suspicion to believe that the defendant was presently engaged in criminal activity by operating a vehicle.

On the limited-appearance issue, we decline to decide definitively whether a criminal defendant with appointed counsel has *some* constitutional right to have a retained attorney enter a limited appearance. Instead, we conclude that *if* such a right exists, it is subject to reasonable regulation by the district court. Under the circumstances of the case, given the extent to which pretrial proceedings had been prolonged and the potential for further delay and disruption, the district court did not abuse its discretion in denying the requested limited appearances.

Having affirmed these rulings, and because we also affirm the district court's ruling denying a mistrial, we uphold the defendant's convictions and sentence.

## II. Background Facts and Proceedings.

**A. The April 23, 2016 Stop and Resulting Charges.** On April 23, 2016, at around 7:30 p.m., Waterloo officers responded to a noise complaint from an individual who resided on Mosely Street. The caller reported what he described as an "ongoing problem" involving a man wearing a backward-facing baseball hat who was loudly playing music from his black Kia Soul.

Two officers, Thomas Frein and Jarid Hundley, responded separately to the call. While they were en route, the dispatcher informed them that the car in question had left the scene. Nonetheless, Officer Frein decided to continue toward the location of the complaint. On his way, he spotted a vehicle and driver

matching the description that had been provided by dispatch. From previous encounters, Officer Frein could identify the driver as defendant Maurice Sallis.

Officer Frein had first learned that Sallis was barred from driving in 2012 as part of a criminal investigation. Officer Frein had updated that information by conducting a license check on Sallis two to six months before the date of this encounter. To the best of Officer Frein's recollection, that check confirmed that Sallis's driving privileges were barred.[1]

Officer Frein turned on his flashers to initiate a traffic stop. As Sallis was turning, and before he came to a stop, Officer Frein saw a bag containing a white, powdery substance—later identified as 24.23 grams of cocaine salt—being thrown from the passenger-side window. According to Officer Frein, "It's very common when that happens to be either in the middle of a turn or while completing a turn."

While Officer Frein pulled over Sallis, Officer Hundley retrieved the jettisoned bag containing cocaine. He then joined Officer Frein at the traffic stop.

Officer Frein had Sallis get out of the Kia, handcuffed him, and read him his *Miranda* rights. Officer Frein asked Sallis if he had a license, and he said he didn't have one. Officer Frein located $1,020 in cash on Sallis's person in the form of ten one-hundred-dollar bills and one twenty-dollar bill. Officer Frein also spotted a half-empty bottle of Remy Martin—an alcoholic beverage—in the

---

[1]After Officer Frein stopped Sallis, he had Officer Hundley check the current status of Sallis's license. Following the completion of that check, Officer Frein can be heard on the bodycam asking, "Is it barred?" Officer Hundley replies, "Yup." Officer Frein can then be heard saying, "I thought it was."

passenger seat. He further detected an odor of an alcoholic beverage on Sallis's breath and noted that "Mr. Sallis had bloodshot, watery eyes."

Sallis was arrested. On June 6, a five-count trial information was filed in the Black Hawk County District Court charging Sallis with enhanced possession of cocaine with intent to deliver, a class "C" felony; failure to affix a drug stamp, a class "D" felony; unlawful possession of a prescription, a serious misdemeanor; driving while barred, an aggravated misdemeanor; and operating while intoxicated, a serious misdemeanor. Sallis applied for court-appointed counsel. Attorney Ted Fisher from the public defender's office was appointed. Sallis pleaded not guilty and subsequently waived speedy trial.

**B. Pretrial Proceedings.** Approximately six months later, on December 19, 2016, Robert Montgomery of the Parrish Law Firm filed a limited appearance on behalf of Sallis. Montgomery limited his representation to "[p]retrial proceedings including discovery/discovery depositions, and any and all motions or applications relating thereto and/or arising therefrom, and motions to continue trial and continue pretrial." The scope was not to include "pretrial conference, trial-related motions in limine, or trial, particularly since [Montgomery] is unavailable at times currently scheduled for pretrial and trial."

Montgomery also filed motions for depositions; for the appointment of an investigator at state expense; and to extend the timelines for discovery, pretrial, and trial. The district court denied these motions because the public defender's office had an existing allowance for funding depositions, the office already had an in-house investigator which eliminated the need for an additional

investigator, and Montgomery's limited appearance provided that he would not participate in either pretrial conferences or trial. Montgomery also filed a motion to suppress on Sallis's behalf.

On February 8, 2017, Fisher filed his first motion to withdraw, citing Montgomery's involvement in the case. A hearing was held on the motion, at which the State expressed concern about Fisher's potential withdrawal. The prosecutor pointed out that if Fisher were relieved from the case and Montgomery's appearance remained limited in scope, then defendant Sallis could be without counsel by the date of trial. In that event, "someone will have to be reappointed and get back up to speed on this case," which could potentially cause delays and difficulties in the proceedings.

Following the hearing, the district court ordered Montgomery to withdraw his limited appearance and to enter a general appearance by March 3 if he wished to continue in the case; otherwise, Fisher would remain Sallis's counsel.

Montgomery did not enter a general appearance. Instead, Fisher remained Sallis's counsel. On June 26, Fisher handled the evidentiary hearing on the motion to suppress. At the hearing, Officer Frein testified, and his dashcam video and Officer Hundley's bodycam video were received into evidence.

On June 30, Fisher asked again to withdraw from the case, citing an "irreparable breakdown" in the attorney–client relationship.[2] During the hearing on this second motion to withdraw, Fisher told the district court that Sallis had

---

[2]At the same time, Fisher also filed a motion asking the district court to withhold ruling on the motion to suppress pending the appointment of new counsel. The court granted this motion.

sent him "an e-mail requesting some very specific legal things, [from] which it was pretty clear . . . that was driven by Mr. Montgomery." In addition, Fisher stated that he and Montgomery were "not on the same page" as to strategy and did not "see eye-to-eye" on the legal issues. In one instance, according to Fisher, Montgomery had requested specific actions from Fisher, threatening that if Fisher did not comply with the request, then Montgomery would engage in steps consistent with the Iowa Rules of Professional Conduct. Fisher added, "In [fifteen] years, I haven't experienced this type of situation, Judge, and I don't believe I can effectively continue to represent Mr. Sallis because of this breakdown for which . . . Montgomery is in the mix . . . ."

After hearing from the interested parties, the district court granted Fisher's second motion to withdraw and appointed contract attorney Donna Smith to represent Sallis. On November 11, Smith filed a written "closing argument brief" on the still-pending motion to suppress. One month later, on December 11, the district court entered an order denying the motion to suppress. The court reasoned that the traffic stop could be sustained on two independent grounds:

> Here the officer had reasonable belief that the defendant was the individual operating the motor vehicle in the loud music complaint. He had reasonable belief that the driver of the Kia was the individual involved in the loud music complaint and wanted to investigate said complaint. An officer is able to stop a motor vehicle concerning criminal activity that has occurred or is occurring.
>
> The officer had an additional reasonable reason to investigate the driver of the Kia. He knew the driver on sight and believed the defendant's license was barred. Most barments are for from two to six years and as such the officer had a reasonable belief the defendant would remain barred even 60 days after the last time he checked the official record.

Meanwhile, on December 8, Montgomery had filed a second application for a limited appearance. Here, his scope of representation would be limited to "the already-filed Motion To Suppress, including submitting brief and offering argument thereon—exclusively on the Motion To Suppress only." Attached to the application was an additional brief in support of the motion to suppress.

That same day, Smith filed a motion to compel production of any prior requests Officer Frein had made for Sallis's driving record. On December 19, the motion to suppress now having been denied, Smith filed a motion to reopen the record on that motion to allow for additional briefing and evidence, including evidence derived from the recently-filed motion to compel.

On December 20, the district court held a lengthy, nearly two-hour hearing on Montgomery's second application for a limited representation of Sallis. The court heard from Montgomery, Smith, and the prosecutor. Montgomery clarified that he would have preferred to make a general appearance rather than a limited one, but his schedule did not allow for it. Montgomery added that initially he had been working under a retainer provided by Sallis's family members, but due to the exhaustion of funds, his representation had become pro bono.

During the give and take of the hearing, the district court indicated it would not have a problem with Montgomery simply filing a separate brief in support of the motion to suppress. The court's concerns, rather, were that Montgomery was unwilling to actually limit his representation to that specific matter, that he would be continuing to have contact with Sallis, and that he was reserving the right to assist with Sallis's representation in the future—while not

actually entering a general appearance. Montgomery, meanwhile, challenged the court's overall authority to regulate limited appearances unless they affected the fairness or integrity of a court proceeding or involved cost to the State.

The district court deferred ruling on Montgomery's application for a second limited appearance because an application for interlocutory appeal from the denial of the motion to suppress was pending. Our court ultimately denied the application. Procedendo issued in early March 2018, and the scene shifted back to the district court.

On April 19, the district court entered an order denying Montgomery's limited appearance.[3] The court explained:

> On its face, a limited appearance appears somewhat harmless. Mr. Montgomery and Ms. Smith stated that they were in agreement as to strategy and procedure concerning Mr. Sallis' case; that they were working well together. The Court, however, must review this matter in terms of whether limited appearances are appropriate on an overall basis concerning criminal cases with court-appointed counsel.
>
> If Ms. Smith were independently retained by the defendant, should a dispute concerning strategy arise between her and Mr. Montgomery, she could merely withdraw. Mr. Sallis could then retain new counsel with similar ideas as Mr. Montgomery. Ms. Smith has been appointed to represent Mr. Sallis as he remains indigent. Should Ms. Smith inform Mr. Sallis that she does not agree with Mr. Montgomery's strategy, Mr. Sallis could request that the Court allow Ms. Smith to withdraw and that new counsel be appointed. The right to counsel as an indigent defendant is circumscribed. The defendant is not allowed to fire various court-appointed counsel because of disagreements in strategy or personality. The defendant is not guaranteed counsel of his choice. . . .
>
> . . . .

---

[3]That same day, the district court also entered an order denying Smith's motion to reopen the record on the motion to suppress.

When a pro bono attorney enters a limited appearance, various consultations between counsel are necessary. The indigent defendant, initially at the state public defender's expense, is required to pay additional fees to court-appointed counsel for consultation with the pro bono limited appearance attorney. . . . Strategy among two lawyers assigned to the same case is seldom without problems. Each experienced counsel has his or her own beliefs concerning strategy and appropriate procedures in the defense of any criminal case. To force court-appointed counsel to always converse with, confide in, and discuss strategy with counsel on a limited appearance would be inappropriate. Any counsel on a limited appearance, pro bono basis may have ideas about a case that are not in agreement with court-appointed counsel. Once those ideas are exposed to the defendant, he or she may not wish to continue with the strategy of court-appointed counsel. Unfortunately, counsel who has entered his or her limited appearance can then easily withdraw after having caused turmoil and upheaval in court-appointed counsel's strategy. . . .

The next concern the Court has concerning limited appearances is what limitations must be put in place to avoid the illogical conclusion to which limited appearances could proceed. An attorney could attempt to enter a pro bono limited appearance for purposes of arguing motions in limine, opening statement, or direct or cross-examination of any one witness. The possibilities are endless as are the problems created with limited appearances.

It is certainly possible that pro bono limited appearance counsel may wish to proceed with issues that may not be in the defendant's best interests concerning his defense strategy as a whole. Counsel whose limited duty is to represent the defendant on a singular issue may not be able to provide the best advice to the defendant concerning his or her overall strategy. Counsel entering a limited appearance will only have reviewed the necessary documentation to proceed concerning his or her limited issue. Additional evidence or witnesses may be involved that might lead regular counsel to believe that proceeding on a limited issue would be inappropriate. This could easily occur concerning potential plea agreements or agreements to testify against a codefendant. Counsel entering a limited appearance and promoting his or her viewpoint concerning the limited issue, may not provide advice in the defendant's best interests. Conflict would ensue between counsel for no reason other than the interference of counsel on a limited appearance basis.

Discovery could also prove to be a nightmare concerning limited appearances. Competing strategies and methods could be detrimental to the defendant's case. Timing of depositions and other discovery could prove perilous. Costs for the defendant and initially the state public defender's office could be substantial should an attorney be allowed to enter a limited appearance for discovery purposes.

The defendant is provided with court-appointed counsel that have met the various guidelines established by the state public defender's office. Appointed counsel are licensed, competent attorneys who have established the criteria necessary to allow them to participate in the state public defender court-appointed counsel system.

All rights that we enjoy are circumscribed. In the above-captioned matter, the Court finds that for the above-stated reasons that limited appearance by pro bono or paid counsel in a case in which the defendant has court-appointed counsel is inappropriate.

Montgomery filed an application for interlocutory appeal from this order, which our court denied.

Meanwhile, Sallis failed to appear for pretrial hearings in May 2018. A warrant was issued for his arrest, and bond was forfeited. A year and a half later, in January 2020, Sallis was rearrested and brought before the court. Sallis's criminal case went through several other attorneys, two of whom were permitted to withdraw because of a "breakdown in the attorney–client relationship," before it reached John Standafer, the attorney who actually tried the case in June 2021.[4]

---

[4]Standafer did not get to try the entire case. After the presentation of evidence had concluded, Standafer notified the court of his intention to withdraw from the case, and Sallis asked the court to let him deliver a pro se closing argument. After fully informing Sallis of the potential risks of this course of action, the district court allowed Sallis to deliver a pro se closing argument. Standafer was not removed from the case, however, and represented Sallis for purposes of posttrial motions and sentencing.

**C. Trial and Appeal.** During the trial, the State asked Officer Frein, on direct examination, why he had opened the driver's door and removed Sallis from the Kia immediately after stopping it. The exchange went as follows:

Q. When we see here, when we stop at one minute into the video, what are you doing?

A. I'm getting Mr. Sallis out of the car.

Q. Okay. Now, did you open that door?

A. I did.

Q. And why were you opening that door and getting him out immediately?

A. He'd already discarded evidence out of the car and since I was out of my car, I didn't want to give him the opportunity to drive off.

Q. What do you mean drive off?

A. It's common that when—if a subject is going to flee from the police in their car, that they'll wait for the officer to get out of the car to kind of give themselves a head start and then they'll take off from there.

Q. And were you concerned about Mr. Sallis being a flight risk at that time?

A. Yes.

MR. STANDAFER: I object before the answer is in. I need to approach. I ask for a mistrial.

The defense's motion for a mistrial was denied, and the trial continued.

Two of the charges were resolved without a jury verdict: the prescription drug charge was dismissed shortly before trial, and Sallis pleaded guilty to the OWI charge during trial. *See* Iowa Code § 321J.2(1) (2016). Following the presentation of evidence and closing argument, the jury returned verdicts of guilty on the remaining counts of cocaine possession with intent to deliver,

failure to attach a drug stamp, and driving while barred. *See id.* § 124.401(1)(*c*)(2)(*b*); *id.* § 453B.12; *id.* § 321.561. Sallis stipulated to the enhancement on the cocaine possession with intent to deliver charge. *See id.* § 124.411.

On August 20, Sallis was sentenced to concurrent terms of imprisonment of twenty years on the enhanced cocaine possession with intent to deliver charge, five years on the drug stamp charge, two years on the driving while barred charge, and one year on the OWI charge. *See id.* § 124.411(1); *id.* § 902.9(1)(*d*); *id.* §§ 903.1(1)(*b*), (2). Sallis appealed, and we retained the appeal.

Sallis raises three claims on appeal. First, Sallis argues that the district court erred in overruling his motion to suppress all evidence from the traffic stop because neither a completed misdemeanor (the noise ordinance violation) nor allegedly stale information (prior knowledge of barred driving privileges) were sufficient to justify the traffic stop. Second, Sallis contends that the district court violated his right to counsel under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution by denying Montgomery's requests for a limited appearance in the case. And third, Sallis claims that the district court incorrectly failed to grant a mistrial after the State elicited testimony allegedly depicting him as a flight risk.

### III. Standard of Review.

When a defendant challenges the denial of a motion to suppress based on an asserted constitutional violation, we review the district court ruling de novo. *State v. Hunt*, 974 N.W.2d 493, 496 (Iowa 2022). We also review de novo claims

alleging denial of a constitutional right to counsel. *State v. Sewell*, 960 N.W.2d 640, 642 (Iowa 2021). Lastly, we review the denial of a mistrial based on alleged prosecutorial misconduct for abuse of discretion. *State v. Veal*, 930 N.W.2d 319, 327–28, 335 (Iowa 2019).

**IV. Analysis.**

**A. Should Sallis's Motion to Suppress Evidence Have Been Granted?** The Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution protect individuals from unreasonable searches and seizures by the government. Sallis makes the same arguments under both constitutions.

A recognized exception to the warrant requirement "allows an officer to stop an individual or vehicle for investigatory purposes for a brief detention based only on a reasonable suspicion that a criminal act has occurred or is occurring." *State v. Baker*, 925 N.W.2d 602, 610 (Iowa 2019). "The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning." *Id.* (quoting *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002)). "The stop is for a brief detention, and therefore '[a]n officer may make an investigatory stop with "considerably less than proof of wrongdoing by a preponderance of the evidence." ' " *Id.* (alteration in original) (quoting *Kreps*, 650 N.W.2d at 642).

Sallis asks us to consider whether a completed misdemeanor, such as a noise ordinance violation, can ever justify a traffic stop if it occurred outside the presence of the officer. We need not address that argument, though. Instead, we

conclude that the stop may be upheld on an independent ground—namely, Officer Frein's recognition of Sallis and his prior information that Sallis was barred from operating a vehicle. In our view, Officer Frein had reasonable suspicion to stop Sallis, given that he had checked Sallis's driving status as part of a separate investigation two to six months earlier and, to his recollection, determined that Sallis was barred.

Sallis urges that Officer Frein's information was "stale" because it was several months old. Staleness arguments often arise in the warrant context, where probable cause is required. *See, e.g., State v. Bracy*, 971 N.W.2d 563, 566–67 (Iowa 2022) (applying probable cause standard to issue warrant). We have said that "[w]hether information is stale depends on the circumstances of each case." *State v. Randle*, 555 N.W.2d 666, 670 (Iowa 1996). We have not previously addressed a staleness argument in this context.

In support of his position, Sallis directs us to *Moody v. State*, 842 So. 2d 754 (Fla. 2003) (per curiam). That case involved a stop based on suspicion that the defendant had a suspended license. *Id.* at 755. The Florida Supreme Court noted that it could have been as long as three years since the officer had last checked the defendant's driving status. *Id.* at 758. Finding that information too outdated, the court invalidated the stop. *Id.* As the court put it:

> [The defendant] could have easily obtained a valid license before [the officer] stopped him on May 23, 1994. Based on these facts, it cannot be said that [officer] had fresh knowledge concerning [the defendant] or the status of his driver's license at the time of the traffic stop on May 23, 1994.

*Id.*

This case is different and falls within a time range that courts have generally found acceptable. Recently, for example, the Florida District Court of Appeal distinguished *Moody* and upheld a traffic stop where the officer had previously arrested the defendant for driving with a suspended license on two other occasions, the most recent of which took place three months prior to the stop. *Valero v. State*, 301 So. 3d 1021, 1022–23 (Fla. Dist. Ct. App. 2019). The Florida court noted that "several federal and out-of-state courts have concluded that lapses of between three-and-a-half and five months did not make an officer's information stale." *Id.* (citing cases). The court also emphasized that the deputy was "not required to *know* that [the defendant's] license was in suspension; what was required was a reasonable articulable suspicion that [the defendant] might be driving on a suspended license." *Id.* at 1023 (quoting *Anderson v. State*, 592 S.E.2d 910, 913 (Ga. 2004)).

As the district court observed in this case, driving bars in Iowa typically run from two to six years. *See* Iowa Code § 321.560(1) (describing a period of "not less than two years nor more than six years"). This length of time is relevant in determining how up-to-date the officer's information must be. As the Hawaii Supreme Court has noted, we ought to consider "the freshness of the officer's information . . . combined with the nature of the license revocation or suspension." *State v. Spillner*, 173 P.3d 498, 509 (Haw. 2007). Here the stop occurred within two to six months of Officer Frein's latest determination that Sallis was barred from driving.

Other out-of-state authority also supports the district court's determination that Officer Frein had reasonable suspicion sufficient to stop Sallis's vehicle. In *State v. Nunez*, the Missouri Court of Appeals upheld a traffic stop where the officer recognized the defendant and "knew that Defendant had his driver's license revoked several months earlier." 455 S.W.3d 529, 531 (Mo. Ct. App. 2015). The court pointed out that in Missouri, "[a] driver whose license has been revoked cannot obtain a new license for at least one year." *Id.* at 532. The court concluded that this law, when combined with the knowledge that several months earlier the defendant had had his license revoked, tallied up to reasonable suspicion. *Id.* The court cited with approval an earlier Missouri case where the court of appeals had upheld a stop after the officer recognized the defendant and "had personal knowledge that eight months earlier [the defendant's] driver's license was under revocation." *Id.* (quoting *State v. Spurgeon*, 907 S.W.2d 798, 800 (Mo. Ct. App. 1995)); *see also United States v. Pierre*, 484 F.3d 75, 84 (1st Cir. 2007) (finding that police officer had reasonable suspicion to pull over a driver he recognized as having had a license suspension five months earlier); *State v. Harris*, 513 S.E.2d 1, 3–4 (Ga. Ct. App. 1999) (holding the officer's stop was proper where he knew the driver's license was suspended three weeks ago and some suspensions last up to five years); *Commonwealth v. Deramo*, 762 N.E.2d 815, 817, 819 (Mass. 2002) ("[B]ased on his observation of the defendant's vehicle and his knowledge that the defendant's license had, as of two months earlier, still been subject to two lengthy periods of revocation, [the officer] reasonably suspected that the defendant was committing

the crime of operating a motor vehicle without a valid license."); *State v. Duesterhoeft*, 311 N.W.2d 866, 866–68 (Minn. 1981) (finding the officer's stop did not violate the Fourth Amendment when he had personal knowledge the driver's license was suspended one month earlier); *State v. Yeargan*, 958 S.W.2d 626, 633 (Tenn. 1997) (upholding a stop where "the officer had personal knowledge that [the defendant's] driver's license had been revoked for a period of one year, and that only six months had passed since the revocation"); *State v. Gibson*, 665 P.2d 1302, 1304 (Utah 1983) (upholding a stop where the officer knew as of approximately three months prior that defendant's license had been revoked).

Sallis argues that the traffic stop was invalid because during the interim two to six months since Officer Frein's last check, he could have had his license restored or obtained a temporary restricted license. Sallis also argues that Officer Frein could have run a new check to verify his current driving status. These possibilities and alternative courses of action do not undermine the existence of reasonable suspicion in this case. Officer Frein was within his rights in stopping Sallis to determine whether his driving privileges were still barred. Because both the Fourth Amendment and article I, section 8 allow traffic stops based on reasonable suspicion of criminal activity, *see, e.g.*, *State v. Struve*, 956 N.W.2d 90, 95–96 (Iowa 2021), we believe the foregoing disposes of Sallis's challenge to the stop under both constitutions.

For these reasons, we hold that the district court properly denied Sallis's motion to suppress.

**B. Did the District Court Violate Sallis's Constitutional Right to Counsel by Refusing an Attorney's Requests to Enter Limited Appearances?**

Sallis next contends that the district court violated his right to counsel under the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution by turning down Montgomery's limited appearance requests filed in December 2016 and December 2017. The United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. And the Iowa Constitution states, "In all criminal prosecutions, . . . the accused shall have a right . . . to have the assistance of counsel." Iowa Const. art I § 10. As before, Sallis does not urge us to deviate from federal precedent in interpreting the state constitutional guarantee.

1. *Limited appearances and the constitutional right to counsel.* Both federal and state constitutions afford a criminal defendant the right to counsel of choice, provided the counsel is not obtained with state funds. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144–46 (2006); *State Pub. Def. v. Amaya*, 977 N.W.2d 22, 30 (Iowa 2022); *State v. Smith*, 761 N.W.2d 63, 69–70 (Iowa 2009). We have added that "no reason exists for depriving an indigent of the same right of choice as a person of means when the indigent is able to obtain private counsel without public expense." *English v. Missildine*, 311 N.W.2d 292, 294 (Iowa 1981).

On the other hand, with court-appointed counsel, a defendant does not have a right to choose their attorney. *State v. McKinley*, 860 N.W.2d 874, 879 (Iowa 2015). If a defendant desires a different court-appointed attorney, they

"must show sufficient cause to justify the appointment of substitute counsel." *State v. Martin*, 608 N.W.2d 445, 449 (Iowa 2000) (en banc). Justifications include a complete breakdown in communications between the attorney and the defendant, irreconcilable conflict, or a conflict of interest. *Id.*

This case presents the question of whether an attorney may have hybrid representation consisting of court-appointed primary counsel, not selected by the defendant, and retained limited-purpose counsel, not paid for by the State.

Each of the parties has staked out a position that leaves little room for accommodating the interests of the other side. Sallis argues that "[a] defendant has the right to the assistance of counsel of his choice if that counsel is not court-appointed"—even if the counsel would only make a limited appearance. The State argues that there is no right to have the services of appointed counsel supplemented by the services of retained counsel even if the State is paying nothing for the retained counsel.

Both positions are, in our view, overstated. The State's position fails to account for the State's limited interest in dictating aspects of a defendant's legal representation as to which the State isn't footing the bill. Why should the State care if an indigent defendant is getting advice on particular matters from a pro bono attorney so long as the State is not *paying* for that advice? In *State Public Defender v. Amaya,* we recently reiterated the general principle that an indigent defendant should have the option of retaining counsel at no expense to the State, while leaving the State to pay other necessary costs of defense that the State would otherwise have to pay and for which the defendant has no available funds.

977 N.W.2d 22, 32, 38 (Iowa 2022). Sallis argues that this case is simply a logical extension of that principle. Here, as in *Amaya*, an indigent defendant is providing part of their defense through an outside arrangement, and the issue is whether the defendant should be free to do that while having the State cover other costs of defense it would have to cover anyway. *See United States v. Zelenka*, 112 F. Supp. 2d 708, 717 (M.D. Tenn. 1999) ("Simply because private counsel is assisting a federal defender in representing an indigent defendant, does not mean that public funds are being misspent."); *Knapp v. Hardy*, 523 P.2d 1308, 1312 (Ariz. 1974) (en banc) ("It is, of course, not improper for a relative of the defendant to hire people to help and assist, and the fact that the indigent defendant already has the aid of the public defender's office does not limit the help a defendant may receive. We feel that it is preferable to have counsel thus assisting to be associated and made a counsel of record with reciprocal rights and duties under our Rules of Criminal Procedure and subject to the direction of the court as to the particular case in which he is involved.").

On the other hand, Sallis overlooks the potentially disruptive effects of limited appearances in criminal cases, especially when the primary counsel has been court appointed. For instance, it may become necessary to compartmentalize proceedings in the case to accommodate the presence of limited-purpose counsel. There may need to be consultations between primary counsel, limited-purpose counsel, and the defendant. These hearings and consultations can result in delays and extra expense.

Where both primary counsel and limited-purpose counsel are retained, the bottom line is that the client *chose* both counsel. In that circumstance, there is an incentive among the client and both counsel to work with each other to minimize client expense. And typically, if there is disagreement, primary counsel would be expected to have the final say as the attorney ultimately responsible for the case.

But when primary counsel is appointed, the situation may be somewhat different. The defendant did not select their primary counsel and is not paying for their services. Thus, the defendant may not particularly care whether primary counsel is incurring additional time and expenses. They might not even care whether appointed counsel remains in the case or is replaced by another primary counsel. Also, the path for resolving disagreements between limited-purpose counsel and primary counsel is less clear. Limited-purpose counsel may have a better relationship with the client than primary counsel. But does that mean court-appointed counsel should yield to limited-purpose counsel because of the relationship with the defendant?

In a related vein, we have said that there is no constitutional right to hybrid representation consisting of a mix of self-representation and representation by appointed counsel. *See Hrbek v. State*, 958 N.W.2d 779, 788–89 (Iowa 2021) (collecting cases with a similar holding). Some of the same concerns about duplicative proceedings and disagreements concerning how to defend the case are present there. *See State v. Mott*, 759 N.W.2d 140, 147 (Iowa Ct. App. 2008) ("The court, however, is not required to permit this form of hybrid representation

where both the pro se defendant and standby counsel are actively participating as defense counsel at trial.").

2. *Limited appearances under the Iowa Rules of Criminal Procedure.* As currently framed, the Iowa rules do not shed much light on when limited appearances are permitted in criminal cases. The State cites a case from next door in Nebraska—*State v. Dixon*, 835 N.W.2d 643 (Neb. 2013). In *Dixon*, the Nebraska Supreme Court sustained a trial court's refusal to allow a limited appearance in a criminal case where the defendant had regular, court-appointed counsel. *Id.* at 649. A private attorney, paid for by the defendant's fiancé, sought to appear for the "limited purpose of attempting immediate resolution of [the] case without necessity of a trial or complex hearings." *Id.* at 646. As in the present case, the trial court in *Dixon* instructed the attorney that he needed to "fully represent [the defendant] or not represent her at all." *Id.* The Supreme Court of Nebraska upheld this ruling, noting that the Nebraska Rules of Professional Conduct at the time prohibited limited appearances: "[A] limited appearance may be entered by a lawyer only when a person is not represented." *Id.* at 648–49 (quoting Neb. Ct. R. of Prof. Cond. § 3-501.2(d)).

*Dixon*'s holding is of limited value here because Iowa does not have a similar rule. Instead, Iowa Rule of Professional Conduct 32:1.2(c) provides, "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent." But saying that an attorney *may* ethically undertake a limited representation in Iowa is not the same as saying that it is permitted in every criminal case. To the contrary, as

noted in the preamble, "The rules [of Professional Conduct] presuppose a larger legal context shaping the lawyer's role. That context includes . . . substantive and procedural law in general." Iowa R. of Prof'l Conduct ch. 32 pmbl. [15].

The State notes that the Iowa Rules of Criminal Procedure contain only three references to limited appearances, all in connection with expungement proceedings. *See* Iowa Rs. Crim. P. 2.80(1) (expungement of dismissed cases or acquittals), 2.81(1) (expungement of eligible misdemeanor convictions), 2.82(1) (expungement of public intoxication, possession of alcohol under the legal age, and certain prostitution cases). The State relies on the canon *expressio unius est exclusio alterius* to argue that limited appearances are not permitted in *other* criminal contexts. *See, e.g., Struve v. Struve*, 930 N.W.2d 368, 376–77 (Iowa 2019) (applying the canon).[5]

By way of contrast, the Iowa Rules of Civil Procedure provide blanket authority for limited appearances. Rule 1.404(3) states:

> Pursuant to Iowa R. Prof'l Conduct 32:1.2(c), an attorney's role may be limited to one or more individual proceedings in the action, if specifically stated in a notice of limited appearance filed and served prior to or simultaneously with the proceeding. If the attorney appears at a hearing on behalf of a client pursuant to a limited representation agreement, the attorney shall notify the court of that limitation at the beginning of that hearing.

---

[5]The proposed amendments to the Iowa Rules of Criminal Procedure that were circulated for public comment in March 2020 and again in June 2022 would expressly prohibit a limited appearance in a case like this. *See* Iowa Sup. Ct. Supervisory Order, *Request for Public Comment on Proposed Amendment to Chapter 2, Iowa Rules of Criminal Procedure* (Mar. 2020), proposed rule 2.28(2) ("Limited appearances are not allowed in criminal cases where there is appointed counsel."); Iowa Sup. Ct. Supervisory Order, *In the Matter of Accepting Further Public Comment on the Proposed Revised Chapter 2 Iowa Rules of Criminal Procedure* (June 2022), proposed rule 2.28(2) (same). Final action has not been taken on these proposed amendments.

Iowa R. Civ. P. 1.404(3). The civil rules, however, do not apply to criminal proceedings. *State v. Russell*, 897 N.W.2d 717, 725 (Iowa 2017) ("[O]ur rules of civil procedure do not apply to criminal matters . . . ."); *State v. Wise*, 697 N.W.2d 489, 492 (Iowa Ct. App. 2005) ("The Rules of Civil Procedure have no applicability in criminal cases, unless made applicable by statute.").[6]

In the end, we do not think the Iowa court rules offer much guidance here. The three expungement-related rules each contain identical wording: "The application may be filed by an attorney of record in the case, by an attorney who enters a limited appearance for the expungement proceedings, or by a self-represented defendant." *See* Iowa Rs. Crim. P. 2.80(1), 2.81(1), 2.82(1). These passing references to limited appearances in the expungement context are a weaker basis for invoking *expressio unius* than a rule devoted to limited appearances would be. The reference clearly opens the door to limited appearances for expungement purposes, but we do not read it as closing the door to limited appearances in criminal cases for other purposes.

3. *There is no unlimited constitutional right to a limited appearance in a case with retained counsel.* Sallis argues that regardless of what the Iowa court rules might or might not say, he has a Sixth Amendment and article I, section 10 right to have counsel of his choice enter a limited appearance (or multiple limited appearances). He cites no on-point authority. To the contrary, in *Dixon*, the court

---

[6]Sallis contests this point somewhat. He notes that Iowa Rule of Civil Procedure 1.101 states, "The rules in this chapter shall govern the practice and procedure in all courts of the state, except where they expressly provide otherwise or statutes not affected hereby provide different procedures in particular courts or cases." Yet Sallis fails to acknowledge the countervailing language in Iowa Rule of Criminal Procedure 2.1(1): "The rules in this section provide procedures applicable to indictable offenses."

rejected the defendant's Sixth Amendment argument that he had a right to limited-representation counsel of his choice in a case where he was represented by court-appointed counsel. 835 N.W.2d at 648. Likewise, in *People v. Aceval*, the Michigan Court of Appeals found no Sixth Amendment violation when the trial court ordered the defendant's retained trial counsel to remain in the case, rejecting his motion to withdraw, and refused to allow another retained counsel to continue in the case on a limited basis. 764 N.W.2d 285, 291–92 (Mich. Ct. App. 2009). As originally occurred here with attorney Fisher, the primary counsel in *Aceval* sought to withdraw "because of a breakdown in the attorney–client relationship that he attributed to [the limited-appearance counsel's] increased involvement." *Id.* at 290.

Thereafter, in *Aceval v. MacLaren*, the United States Court of Appeals for the Sixth Circuit denied the same defendant's challenge to his conviction on federal habeas review. 578 F. App'x 480, 481 (6th Cir. 2014). Applying the deferential standard of review that applies to federal habeas collateral review of state court legal determinations, the court declined to overturn the defendant's conviction. *Id.* at 482. It noted the absence of any Supreme Court precedent establishing a defendant's entitlement "to a second, 'limited' attorney responsible for only discrete aspects of the representation." *Id.*

A number of jurisdictions prohibit or sharply restrict limited appearances in criminal cases, either expressly or by direct implication. *See* Conn. Prac. Book § 3-8(b) ("A limited appearance may not be filed in criminal or juvenile cases, except that a limited appearance may be filed pursuant to Section 79a-3(c)(1)

[which governs "Filing of the Appeal" in child protection matters].."); Mich. Ct. R. 6.001(D) ("The provisions of the rules of civil procedure apply to cases governed by [the rules of criminal procedure], except . . . with regard to limited appearances and notices of limited appearance."); Neb. Ct. R. of Prof. Cond. § 3-501.2(d) ("[A] limited appearance may be entered by a lawyer only when a person is not represented."); Nev. Dist. Ct. R. 26 (omitting criminal proceedings when it lists the areas where "[l]imited scope representation shall be permitted"); N.C. 21 Jud. Dist. Crim. P. R. 2.0 (local rule of Forsyth County stating that "[l]imited appearances in Superior Court will be discouraged"); N.C. 14 Jud. Dist. Case Mgmt. Sys. R. 3.1 (local rule of Durham County stating that ("[d]iscovery material shall not be distributed to defense counsel entering only a limited appearance" and "[l]imited appearances are discouraged as they typically result in unnecessary delay"). These out-of-state examples tend to undermine the view that there is a blanket constitutional right to limited counsel so long as the State doesn't have to pay anything.

Given Sallis's inability to cite any directly relevant legal authority, we are not persuaded that either the Sixth Amendment or article I, section 10 guarantees a defendant who already has primary, court-appointed counsel an *unlimited* right to deploy secondary, limited-representation, retained counsel. Likewise, for the reasons we have already stated, we are not persuaded that the Iowa court rules recognize limited appearances in criminal cases apart from expungements.

4. *No abuse of discretion in this case.* Thus, to the extent any right to engage limited-representation counsel in the pretrial phases of a criminal case exists—a matter we do not decide today—it must be tempered by the trial court's legitimate interest in managing the proceedings before it. *See, e.g., State v. Johnson*, 756 N.W.2d 682, 689 (Iowa 2008) (holding that "a trial court has the discretion to limit standby counsel so long as those limitations are reasonable"); *State v. Williams*, 285 N.W.2d 248, 255 (Iowa 1979) ("[T]he right to choice of counsel by both indigent and non-indigent defendants is limited by trial court discretion to maintain an orderly trial process.").[7]

In this case, the court had legitimate reasons for denying Montgomery's two applications to enter a limited appearance. The first was coupled with an application by the primary attorney, Fisher, to withdraw. Fisher could not, or would not, work with Montgomery. Thus, allowing Montgomery to enter only a limited appearance would have resulted in a new primary counsel having to be appointed and further delay in the proceedings.

The second application was explicitly for the purpose of supplementing the briefing and record on "the already-filed Motion To Suppress." At the hearing on the second application, Montgomery also asserted a right to be involved in the case in unspecified ways in the future. Yet at the time Montgomery filed this second application, it had been approximately six months since the motion to

---

[7]This case presents an attorney requesting to enter an appearance for a limited purpose in a case that already has court-appointed counsel. We are not addressing the situation where advice might be sought from another counsel—such as immigration or otherwise specialized counsel—without that attorney entering an appearance of any kind. *See e.g., Diaz v. State*, 896 N.W.2d 723, 732 (Iowa 2017) (discussing the obligation of defense counsel to provide certain immigration advice).

suppress had been heard. Sallis's closing brief in support of the motion was already on file. Again, allowing Montgomery to enter a limited appearance would have prolonged the proceedings, in this instance on an already-filed, already-briefed, and already-heard motion to suppress.

Under these circumstances, no reversible error occurred when the district court denied the applications for limited appearance. We agree with the district court that it "has the ability to control limited appearances." In its order, the district court raised concerns about additional consultations, duplication of proceedings, competing strategies, and the potential that court-appointed counsel would seek to withdraw. We do not necessarily agree with the district court that those problems would arise in *every* case where an attorney seeks to make a limited appearance and the defendant already has court-appointed counsel. But they existed in *this* case, and that is enough to sustain the court's denial of the applications under the abuse of discretion standard that we apply.

We do not question Montgomery's good faith, his devotion to his client's best interests, or his legal strategies. We simply conclude that under the circumstances of this case, the district court acted within its discretion to manage the proceedings by denying the applications. For these reasons, we affirm the district court's orders denying the applications for limited appearance.

**C. Should the District Court Have Excluded the Officer's Testimony About Why He Got Sallis Out of His Car Immediately?** Sallis claims he was unfairly tarnished by Officer Frein's testimony that he got Sallis out of the Kia right away because he was concerned about Sallis being a flight risk. We see no

abuse of discretion. This line of testimony was designed to explain Officer Frein's aggressive course of action as shown on video. Jurors might otherwise have wondered what was going on because the typical traffic stop does not result in an order to exit the vehicle and immediate handcuffing.

Officer Frein testified that he had seen Sallis discard something from the car. He testified that based on his general experience—i.e., not his experience with Sallis specifically—it is common for a subject who wants to flee to wait for the officer to get out of their patrol car and then drive off. We agree with the district court that this somewhat generic testimony about police methods was unlikely to have been of much consequence in the case. An adverse effect became even less likely after Sallis's trial counsel clarified on cross-examination that Officer Frein had never arrested Sallis before.

Sallis points us to *State v. Wilson*, where we described the chain of inferences necessary to establish evidence of flight as probative of the defendant's guilt. 878 N.W.2d 203, 212–13 (Iowa 2016). *Wilson* has no bearing here because Sallis did not flee the scene and the State was not attempting to argue that any inference of guilt should be drawn from how the stop was conducted.

Accordingly, we find no error in the district court's denial of Sallis's motion for a mistrial.

**V. Conclusion.**

For the reasons stated, we affirm Sallis's conviction and sentence.

**AFFIRMED.**